CHATTANOOGA & TENNESSEE RIVER POWER CO. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. December 2, 1913.)

No. 2,355.

MASTER AND SERVANT (§ 13*)—EIGHT-HOUR LAW—"PUBLIC WORK OF UNITED STATES."

A lock and dam across a navigable stream, constructed under a contract with the United States authorized by act of Congress, and the title to which is in the United States, although the contractor receives in payment the privilege of using the surplus water for the generating of electric power for the term of 99 years, subject to the condition that such use shall not interfere with navigation, is "a public work of the United States," within the meaning of Eight-Hour Law Aug. 1, 1892, c. 352, § 1, 27 Stat. 340 (U. S. Comp. St. 1901, p. 2521), prohibiting a contractor for such work from requiring or permitting any laborer or mechanic employed thereon to work more than eight hours in any calendar day, except in case of extraordinary emergency.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. § 13.*]

In Error to the District Court of the United States for the Southern Division of the Eastern District of Tennessee.

Criminal prosecution by the United States against the Chattanooga & Tennessee River Power Company. Judgment of conviction, and defendant brings error. Affirmed.

Williams & Lancaster, of Chattanooga, Tenn., for plaintiff in error. James B. Cox, U. S. Dist. Atty., of Knoxville, Tenn.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. The power company, plaintiff in error, was convicted of violating the act which restricts the daily service of laborers and mechanics employed upon the public works of the United States to eight hours. Act August 1, 1892, c. 352, 27 Stat. 340 (U. S. Comp. St. 1901, p. 2521). The power company demurred to the indictment on the ground that it shows on its face that the work in question is not "a public work of the United States," within the meaning of the act alluded to. The demurrer was overruled, the company found guilty and a fine imposed; and error is prosecuted.

The indictment was returned December 5, 1911. It charges in substance that the power company entered into a contract with the United States to build a lock and dam across the Tennessee river, a navigable stream, at Hales Bar, Guild, Tenn., and, further, that while engaged in the construction of the lock and dam, "a public work of the United States," the company "employed, directed, and controlled the services of laborers and mechanics" thereon, and "intentionally required and permitted" them "to work more than eight hours in a calendar day, when there was no extraordinary emergency." The contract is incorporated into the indictment by exhibit, and specifically refers to the acts of Congress pursuant to which it was executed.

Accepting under the demurrer the recitals contained in the contract, the requisite conditions existed to authorize it to be entered into, as it was September 12, 1905, according and subject to the provisions of the act passed April 26, 1904 (33 Stat. pt. 1, p. 309, c. 1605), as, amended January 7, 1905 (Id. p. 603, c. 32).[1] The task set for us is to determine whether the work described in the contract and authorized by these acts of Congress is "a public work of the United States" within the meaning of the act of August 1, 1892, commonly known as the "Eight-Hour Law"; for the fact that the power company entered into the contract with the United States, and so nominally falls within the word "contractor" found in the Eight-Hour Law, cannot be questioned. The acts authorizing the contract, and the contract itself, provide for the construction of an efficient lock and dam in the Tennessee river; and the power company is required to and does undertake at its expense to furnish everything (save only the plans and certain specified materials which the government is to furnish), and to do all that is necessary to accomplish this result, and to vest title

---

[1] The amendment needs to be examined only to find authority in the Secretary of War to change the location of the lock and dam from that mentioned in the act of April 26, 1904; and this act is too long to be quoted here.

to the whole in the United States; and the power company does this in consideration of receiving from the United States a grant of "such rights as it possesses to use the water power produced by said dam, and to convert the same into electric power or otherwise utilize it," for a specified time, subject, however, to the condition that "nothing shall be done in the use of the water" from the dam to interfere with navigation or with the government's use and control of the water for that purpose. This clearly limits the grant to the use only of surplus water. If, instead of this, a money consideration had been agreed upon, there could be no question touching the character or ownership of the work; indisputably it would have been one of the public works of the United States. Can it be that the medium of payment can operate to change this result?

It is true that this surplus-water power privilege is in terms to continue for 99 years; but this is subject to the right of revocation upon payment of the reasonable value of such necessary property as the company may acquire for the enjoyment of the privilege, the value of the "franchise hereby conferred" being expressly excluded. Thus the surplus-water power privilege is at most a determinable franchise; and this is further burdened with an obligation of the power company to "furnish the necessary electric current while its * * * power plant is in operation to move the gates and operate the locks and to light the United States buildings and grounds, free of cost to the United States." Now it is not the purpose to minimize the practical value of this privilege while it lasts. The attempt is simply to ascertain and define the nature of the privilege. For it is urged that the main object alike of the enactments and the contract was to produce this surplus-water power privilege and acquire part of the benefits of it, and that the lock and dam were a mere incident. It would be anomalous if the government were to regard its powers concerning navigable waters as entitling it to build locks and dams in navigable streams for the sole purpose of producing water power for the benefit of private persons; and yet this is the logic of counsel's insistence.

As Mr. Justice Brown said, in Kaukauna Co. v. Green Bay, etc., Canal, 142 U. S. 254, at page 273, 12 Sup. Ct. 173, at page 177 (35 L. Ed. 1004), followed in Green Bay, etc., Canal Co. v. Patten Paper Co., 172 U. S. 58, 76, 77, 19 Sup. Ct. 97, 43 L. Ed. 364, when considering the effect of a statute of Wisconsin which reserved to the state the surplus water power created by the erection of a dam over the Fox river, a navigable stream:

"Upon the other hand, it is probably true that it is beyond the competency of the state to appropriate to itself the property of individuals for the sole purpose of creating a water power to be leased for manufacturing purposes. * * * But if, in the erection of a public dam for a recognized public purpose, there is necessarily produced a surplus of water, which may properly be used for manufacturing purposes, there is no sound reason why the state may not retain to itself the power of controlling or disposing of such water as an incident of its right to make such improvement."

A rule of decision of long standing still prevails in Ohio to the effect that, upon the state's abandonment of a portion of one of its canals, it is not liable to its lessees of surplus water derived therefrom; Judge

West saying, in Hubbard v. City of Toledo, 21 Ohio St. 379, 398, followed in Elevator Co. v. Cincinnati, 30 Ohio St. 629, 642:

"If·it were otherwise, the state would be compelled to maintain her canals, at any sacrifice, for the exclusive benefit of the lessees of surplus water. This· cannot be. The creation of water power did not enter into the purpose of their construction. It was adventitious, incidental, and, therefore, nec.,ssarily precarious; and those obtaining grants thereof must be supposed to have taken them subject to the fluctuations of tides and the changes of time."

And Mr. Chief Justice Waite said, in Fox v. Cincinnati, 104 U. S. 783, at page 785 (26 L. Ed. 928), when considering a similar question originating in Ohio:

"The use of the water for hydraulic purposes is but an incident to the principal object for which the canal was built, to wit, navigation."

Furthermore, the intent to be deduced from the whole legislation . was to increase the depth of the water in this portion of the Tennessee river for purposes of navigation; and there is nothing concerning the design as to *surplus* water to indicate that anything more was contemplated than a subordinate and incidental object. As Judge Sanford points out in the opinion below, Congress took steps as early as 1899 to improve this part of the river for purposes only of navigation. It appropriated $35,000 for "improving Tennessee river between Chattanooga and Riverton," Ala., and provided that:

"In making the survey between Chattanooga and Shellmounds through that portion of the river commonly called the 'Suck,' an examination shall be made· with a view to the construction of locks and dams suitable for convenient and safe navigation." Act March 3, 1899, c. 425, 30 Stat. 1142, 1143.

While it is true that the act of 1904 made provision for the water power privilege above mentioned, yet the dominant feature of the act was plainly to promote the interests of navigation. To illustrate, section 1 of the act requires the contractor to—

"purchase and pay for all the lands on either side of the river that may be necessary to the successful construction and operation of said lock and dam, including flowage rights and rights of way for ingress and egress from public highways and deed the same to the United States."

And section 7 provides that:

"To insure compliance with the terms of the contract or of this act, or to protect the interests of navigation, the Secretary of War shall have power at any time, before or after the completion of the work, to order a suspension of all privileges granted by this act."

In short, when all that the act prescribes respecting the improvement directly affecting navigation is considered in contrast with that which concerns the surplus-water privilege, no room is left for doubt as to which is the principal thing and which the incident.

It is equally clear that the main improvement comprised the lock and dam, and was intended to constitute one of the public works of the United States. It is not suggested that the power company failed to discharge, and so it is to be presumed that it performed, its obligation under the contract to purchase and within six months to convey to the government such lands as were necessary for the improvement; and, moreover, the materials for the lock and dam were to be furnished

by the government and the contractor was to do the work. Hence the case falls within the principles characterizing public works of the United States, as announced in Title Guarantee & Trust Co. v. Crane Co., 219 U. S. 24, 31, 31 Sup. Ct. 140, 55 L. Ed. 72, and Ellis v. United States, 206 U. S. 246, 258, 27 Sup. Ct. 600, 51 L. Ed. 1047, 11 Ann. Cas. 589, because the title was in the United States, and the lock and dam were permanent in nature and essential to the structural unity and the use of the improvement.

In view, then, of the charges contained in the indictment and its date, as pointed out at the beginning of this opinion, the judgment below must be affirmed.