CHATTANOOGA & TENNESSEE RIVER POWER CO. *v.*
LAWSON.

(*Nashville.* December Term, 1917.)

1. EMINENT DOMAIN: Compensation. Dams. Appropriation of lands. Award to landlord.

Erection of Tennessee river dam, backing water over lands adjacent to those occupied by plaintiff as tenant at will, was an appropriation for flowage purposes, all resulting damages from which were compensated by an award to the owner, plaintiff's landlord. (*Post, p.* 369.)

2. UNITED STATES. Government dam. Consequential damages. Liability of contractor.

A private contractor, building a dam to be deeded to the United States in a navigable stream under direction and according to specifications of the United States, is liable only to the same extent as the government, which is not liable for the consequential damages to a tenant at will of one who has been compensated for land taken, by alternate overflow and recession of water, causing stagnation and breeding mosquitoes which infected plaintiff and his family with malaria. (*Post, pp.* 369-371.)

Cases cited and approved: Chattanooga & Tennessee River Power Co. v. United States, 209 Fed., 28; United States v. Lynah, 188 U. S., 445; Gibson v. U. S., 166 U. S., 269; Northern Transportation Co. v. Chicago, 99 U. S., 640; Scranton v. Wheeler, 179 U. S., 141; Union Bridge Co. v. U. S., 204 U. S., 364.

3. UNITED STATES. Dams. Consequential damages. Contractor's liability for torts.

Such contractor, being liable only to the same extent as the government, it is not liable for the tort of failing to remove obstructions and rubbish after each overflow, since the United States is not liable for torts. (*Post, pp.* 371, 372.)

C. & T. R. Power Co. v. Lawson.

4. **UNITED STATES. Dams. Liability of contractor.**

Under agreement of such contractor to save the United States harmless on account of any damage, it was liable only to the same extent as the United States. (*Post, pp.* 371, 372.)

5. **UNITED STATES. Dams. Appropriation of lands. Torts.**

Where a dam was erected for the United States in navigable stream and alternate overflow and recession caused by stagnant pool on land of a private owner, the United States was not liable for failure to drain the pool, since it had no right to go upon private lands for such purpose. (*Post, p.* 372.)

Case cited and approved: Railway Co. v. Telford, 89 Tenn., 293.

6. **NUISANCE. Dams. Contractor's liability.**

That a dam erected for the United States in navigable waters created unhealthful conditions by making stagnant pools of water did not make it a nuisance, nor render the contractor liable as for maintaining a nuisance. (*Post, pp.* 373-376.)

Case cited and approved: Colcough v. Nashville & N. & W. R. Co., 39 Tenn., 171.

7. **UNITED STATES. Dams. Consequential damages. Liability of contractor.**

That a private contractor building dam to be deeded to the United States in navigable stream under direction and according to specifications of the United States retained an interest in the surplus water for power production did not render it liable for merely consequential damages to residents of the vicinity by reason of creation of unhealthful and malarial conditions. (*Post, pp.* 376, 377.)

FROM MARION.

Appeal from the Circuit Court of Marion County to the Court of Civil Appeals, and by *certiorari* to the

Court of Civil Appeals from the Supreme Court.—
FRANK L. LYNCH, Judge.

WILLIAMS & LANCASTER and SPEARS & SPEARS, for
appellants.

TATUM, THACH, LYNCH & HALL and S. B. SMITH, for
appellee.

MR. CHIEF JUSTICE NEIL delivered the opinion of the
Court.

The declaration avers that the defendant in error
was, with his family, occupying as his home a certain
small parcel of land lying near the bank of the Ten-
nessee river; that the plaintiff in error, in the year
1905, or 1906, began the construction of a dam across
the river at Hale's bar, about thirty-eight miles below
the city of Chattanooga, and below the tract on which
defendant in error was residing, as stated; that the
dam was completed about December, 1913; that when
this completion was effected the water above the dam
immediately began to rise until it finally reached the
height of thirty-eight feet above the ordinary low-
water mark, with the result that for a distance of
about thirty-five or forty miles up the river the
water was caused to rise and overflow a large area of
adjacent lands, creating a large lake.

It is further averred that while it was the duty of
the plaintiff in error to so construct the lake as
not to create a nuisance, and this could have

been done by first removing from the land to be inundated all growing crops, trees, bushes, and other vegetable matter, yet the plaintiff in error, unmindful of this duty and without using proper caution to prevent injury to defendant in error and others, wrongfully and negligently allowed a large area of land, on which were large quantities of growing crops, trees, bushes, brush, and other vegetable matter, to be and become overflowed with water, whereby the vegetation above mentioned was caused to decay and emit noxious and poisonous gases, and foul and noisome smells, rendering the atmosphere unwholesome, and thus destroying the heathfulness and comfort of defendant in error's home, and the comfort and health of himself and his family; that on account of the poisonous gases and vapors mentioned defendant in error became ill and suffered great physical pain and anguish; that his wife, Maud Lawson, and his children, Ed, Sam, Bessie, Raymond, and Ransom Lawson all became ill—on account of all which matters defendant in error was unable to perform his customary duties for a period of three months, and was deprived of the services of his wife and children for the like period, and was put to great expense for medical attention, all to his damage, $3,000.

The declaration was subsequently amended by adding the following averment:

"The rise and fall of the river leaves large areas of land, on which large quantities of growing vegetation was negligently left by the defendant, covered,

and partially covered, by water, and defendant negligently failed, as was his duty, to provide proper drainage for this intermittent overflow, so that on account of such lack of drainage and the decay of such vegetable matter large areas of water became stagnant and foul, causing myriads of mosquitoes to be bred, and which, together with the foul odors and noxious smells referred to, caused the injuries complained of.''

The plaintiff in error filed numerous pleas:

First, the general issue of not guilty; second, the statute of limitations of one year; third, accord and satisfaction; fourth, that the dam ''was erected under the direction, control, and specifications of the United States government, in aid of navigation in the Tennessee river, and the work of constructing the said dam was done by the defendant as the agent of the United States government, and in the manner and form prescribed by it, and according to plans and specifications furnished by it, and under and by virtue of an act of Congress, approved April 26, 1904, chapter 1605, 33 Stat., 309, and upon an amended act of Congress, approved January 7, 1905, chapter 32, 33 Stat., 603, and that for any injury the plaintiff hath suffered as the result of said dam, his right, if any, is against the United States government, and not against the. defendant;'' fifth, ''that the said dam is owned by the United States government, and has been owned and controlled by it since its completion, on or about the 5th day of October, 1913, and that this defendant has had no control over said dam since that date, and has

had since then no right or authority to interfere with said dam, or to change or modify any of the conditions which have been caused by the maintenance of said dam and the creation of the lake;" sixth, "that the said dam was constructed by it, as agent of the United States government, which had the same erected by this defendant under and by virtue of an act of Congress, approved April 26, 1904, and by an amended act of Congress, approved January 7, 1905, in aid of navigation in the Tennessee river, and that this defendant had no right or authority, previous to the construction of the dam and the overflow of the lands incident thereto, to go upon such lands and to clear the same from growing crops, trees, bushes, etc., as it was alleged in the declaration it was the duty of the defendant to do, and that the defendant therefore did not wrongfully and negligently allow such lands to be overflowed, as averred in said declaration, and that the damages complained of were caused by the United States government, as incident to the improvements in navigation in the Tennessee river, and not such damages as this defendant is liable for;" seventh, "that the injuries complained of are injuries brought about by the overflow of the lands in the condition in which they were at the time of such overflow, and that the owners of such overflowed lands have been fully compensated for all damages done to said overflowed lands, and that the defendant is not liable for the alleged injuries to plaintiff growing out of damages to lands which were taken by the said overflow and com-

pensated for and on behalf of the United States government in the condition in which the said overflowed lands were at the time of said taking, the same having been taken by such overflow in aid of navigation in the Tennessee river;" eighth, "that the said dam as described in said declaration, and that the work, and place of work, were at all times under the direction, supervision, and control of the United States government, its agents and servants, and that said dam was erected by this defendant in strict conformity to the plans and specifications furnished by the engineers of the United States government, and under their direction, supervision, and control; and since the completion of the same, about October 15, 1913, and the filling of the pool above said dam, the said United States government, its agents and servants, have been operating the said locks, and have had charge of all the work thereat, especially the lock and dam, and that this defendant has had no control of any part of said works, and has exercised no jurisdiction or control thereover since said time;" ninth, "that it was an independent contractor in building the dam described in the plaintiff's declaration, and, as such independent contractor, built the said dam in accordance with the plans and specifications furnished it by the United States government, its principal, and that it fulfilled its further duty to its principal, and carried out its contract with its principal and closed said dam, thus making this pool, and turned over to said government said work, on or about January 1, 1914, and as such

contractor it was never in possession of the river or the waters thereof, or any part thereof, nor of the works therein, and that the river and every part thereof and the works therein were in the possession and control of said United States government at all times during the building of said dam and after its completion.''

Issue was duly joined on the pleas 2 to 9, inclusive.

In due course the case came on for trial, and after the evidence of the plaintiff below was heard the defendant moved for a peremptory instruction, and again after all the evidence was heard. Both motions were overruled. A verdict was rendered in favor of the plaintiff below for $3,000, upon which a remittitur of $1,000 was entered, and thereupon judgment was rendered for $2,000, the balance left. On appeal to the court of civil appeals that court was of the opinion that the trial court committed error in refusing to sustain the motion for peremptory instructions last made, and, acting in accordance with this view, dismissed the action. The case was then brought to this court, by the writ of *certiorari,* and has been fully argued before us.

It should be stated, before further consideration of the case, that all of the grounds of relief stated in the declaration were practically abandoned in the evidence, except that one expressed in the amendment. The case was made to turn on the fact that the dam was so constructed that whenever there was a slight rise, say over six inches, in the river it would over-

flow the adjoining lands, and that, on the water receding, it left a pond embracing about a quarter or half of an acre, lying between the river and the defendant in error's home; that in this pond were bred Anopheles mosquitoes which attacked the defendant in error and members of his family, causing malaria; mosquitoes of the kind mentioned being well-known to science, and shown in the evidence, as carriers of malarial poison.

The learned court of civil appeals were of the opinion that it was impossible to say whether the mosquitoes that inoculated defendant in error and his family with the malarial poison came from the river or the pond, or from a spring branch close to defendant in error's house, or from water barrels near his neighbor's houses; therefore that there was no evidence to charge the defendant in error's injuries to the plaintiff in error.

There was evidence that prior to the filling of the dam, there had been very little malaria in the neighborhood, and none in defendant in error's family, although he had lived in the same place for several years prior to the construction of the dam; that after the filling of the dam and the overflow of the water, and the creation of the pond referred to, defendant and his family, in August, 1914, fell ill of malaria and continued to be ill from time to time; that defendant in error observed large numbers of mosquitoes at the pond; that before the construction of the dam and the overflow of the land there had been a few mosquitoes

in the house; that after the closing of the dam there were a sufficient number of mosquitoes in the house to make it necessary to "fight them," or defend one's self from them. Defendant in error testified that there had always been a few mosquitoes along the spring branch one hundred and fifty yards from the house. No one capable of distinguishing the Anopheles mosquito from other species, examined the mosquitoes in the pond. No one testified to having examined the pond for mosquitoes of this kind. Defendant in error was ignorant of the different species of the mosquito, and was unable to say whether any of them he saw at the pond, or in his house, were of the Anopheles kind. Several of his neighbors living from one-fourth of a mile to a mile from him were affected, also their families, as he and his family were affected in the summer of 1914. His home was within one hundred yards of the river, or lake, made by the river after the dam was closed. There was evidence that the pond created near the defendant in error's house was a place suitable for the breeding of the Anopheles mosquito. There is evidence that the edge of the lake or river was also a suitable place for the breeding of mosquitoes. Some examinations were made of the margin of the river, and no mosquitoes of the kind referred to were found there, but these examinations were made only after a rain or freshet, which was a very unfavorable time for the purpose, the water, under such circumstances, washing the larvæ away if any had been there. However, the pond near the house was

still water, and, as stated, there was evidence that this was a suitable place for the natural breeding of the poisonous mosquitoes mentioned. The pond referred to was on the land of one John L. McNab. Defendant in error's home was also on this same tract of land; he being a tenant at will of McNab. It seems that the defendant in error was a poor man, and McNab had told him some years before to go upon the land and fix up the house, and that he could stay there as long as he wished. He entered upon the land accordingly, and remained there under these terms. He occupied eight acres of the tract on which the pond rested. McNab's tract was on the bank of the river, or lake made by the dam. The lake also rested partly on the McNab tract. The pond, as stated, was between defendant in error's home and the river, and about thirty yards from the river. There is evidence that the pond could have been drained at slight expense; that is, by the digging of a ditch three feet deep and thirty yards long to the river on McNab's land, but that this ditch was not dug and the pond was not drained; that if it had been drained it would have done no injury in the way of breeding mosquitoes; that when the river overflowed this land it freshened the water and removed all cause of complaint, but that in times of low water, when the pond was disconnected from the river, it became stagnant and covered with a green scum, was offensive, and was a breeding place for mosquitoes.

Mr. L. M. Pindell, a government expert, familiar with the different stages of the Tennessee river for a great many years, testified from government records that from January 1, 1879, down to December 31, 1913, a period of thirty-four years, there were one hundred and ten days that the ground where the pond is must have been covered with water; that in January, 1914, it was covered all but three days; in February every day but one; in March every day but five; that it was wholly covered during the month of April; that in May there were twenty-one days in which it was not covered; that it was not covered at all during the month of June; that in July there were five days that it was not covered, and in August one day; that in September it was covered only two days. No one testifies to having seen this ground actually covered during the dates mentioned, but the statement of the expert is made from the different stages of the river at Chattanooga, and the calculation of the difference between Chattanooga and the point where the pond was located. So it may be fairly inferred that the land was covered substantially as stated, and free at the times stated. The uncontradicted evidence is that the plaintiff in error settled with McNab for all injuries done to him and his land.

The dam was about forty-five feet high, and extended across the Tennessee river. On top of this dam the plaintiff in error constructed its power house. The Tennessee river being a navigable stream, it was necessary to procure the consent of the United States.

Accordingly an act of Congress was passed which, in effect, gave the plaintiff in error the right to construct the dam at its own expense, but under the direction of engineers of the United States, and with the proviso that the dam, when completed, should be turned over to the United States and should be its property, but that the plaintiff in error should have the right to use all surplus of water not needed for navigation in the production of electrical power for transmission to Chattanooga and other cities and places of consumption. It was also to be constructed, and was constructed, on plans furnished by the United States. The plaintiff in error was to pay, and did pay, all of the expenses of construction, and was to furnish, and did furnish, all of the materials except the iron doors of the lock. The right of the plaintiff in error to use the surplus water was subject to withdrawal at any time the United States might deem proper on the latter making a certain compensation specified in the contract.

A contract was entered into between the plaintiff in error and the United States according to the terms of the act, and this contract contained the following provision for indemnity; that is to say, that it should be the duty of the plaintiff in error ''to hold and save the United States harmless from and against any and every demand or demands of any nature or kind, for or on account of the use of any patent, instrument, article, or process included in the materials hereby agreed to be furnished and the works to be done under

this contract, or on account of any damage to person
or property resulting from the construction of said
lock and dam.''

Indeed the evidence fully sustains the averments
of fact set forth in the fourth plea; also those contain-
ed in the fifth, except that it appears the plaintiff in
error has, with the permission of the United States,
from time to time erected flashboards on top of the
dam to increase the amount of water retained in
times of low water, and that it has from time to time,
with the like consent, stopped leaks in the dam; that
the flashboards were washed off in times of high water;
with the further exception that the United States took
charge January 1, 1914, instead of on October 5, 1913,
as stated in the plea. The evidence fully sustains the
facts averred in the sixth plea, understanding by the
terms ''right or authority'' therein mentioned to refer
to the fact that it does not appear that any such right
or authority was conferred by the owner of the land.
The evidence fully sustains the averments of fact con-
tained in the seventh, eighth, and ninth pleas. There
is no evidence controverting any of the foregoing aver-
ments. There is evidence to the effect that an ideal
construction of the dam would have required the cut-
ting down of all trees, in the inundated land; also the
cutting out of corn stalks and other vegetation of the
kind, the removal or burning of logs and the cutting
of bushes and shrubs of all kinds; but it is further in
evidence that at the time this dam was constructed,
this was not recognized as being essential to a proper

construction, and that scientific knowledge upon the subject had not sufficiently advanced to justify the conclusion as to the ideal construction mentioned, but that the matter was still under the examination of experts. Plaintiff in error, before it closed the dam, did nothing towards destroying the growing vegetation, or timber on any part of the land that was overflowed by the rise of the river. The waters were backed out over it, and no effort was made to clean the bank of the river, or to cut away any of the brush around the margin of the river. The specifications furnished by the United States required no such thing to be done. The United States, through its officers, inspected every bit of the work, and the lines were run by its men. Its officers were in charge all the time.

Plaintiff in error's power house, as stated, was built on the dam. The substructure of the power house, being a part of the dam, was subjected to the government inspection. It does not appear that the power house itself was conveyed to the government.

From the facts stated, it is apparent that it is impossible for any one to determine whether the malaria in defendant in error's family was caused by mosquitoes from the river or from the pond, both being favorable breeding places, and each near enough to enable these insects to reach defendant in error's home. Although no mosquito of the species complained of was actually found in the margin of the river, or in the pond, no competent search having been made in either place under proper circumstances, yet, compar-

ing the condition of the health of the defendant in error and his family before the dam was closed and afterwards, and remembering that it is only the Anopheles mosquito that inflicts the injury; that they were in the neighborhood, since one or two larvæ were found in the spring branch—we think there was some evidence upon which the jury might have inferred that these mosquitoes were bred in the favorable places mentioned, that is, the margin of the river and in the pond. Both conditions resulted from the same cause, the building of the dam.

The overflow of the McNab lands on which the pond was formed was a natural and necessary incident of the construction of the dam.

We are of the opinion that the invasion of the McNab lands on which the pond rested in the manner set forth in the statement of facts was of such a character as amounted to an appropriation of the lands for flowage purposes.

The question now to be determined is whether, under these facts, the plaintiff in error was liable to the defendant in error for the sickness caused in his family by the river and the pond through the agency of the Anopheles mosquito, on the adjoining land.

We are of the opinion that there was no such liability, and that the motions for peremptory instructions in the trial court should have been granted and the suit dismissed.

The plaintiff in error was only a contractor, under the United States, doing for it the work that was done

for the improvement of navigation of the Tennessee river. The improvement, when completed, became the property of the United States. The plaintiff in error was guilty of no negligence, having performed the work strictly in accord with the specifications furnished to it by its employer. It is not material that the United States, instead of compensating plaintiff in error in money, paid it by permitting the use of the surplus water, and the granting of the right to place its power house on the dam. The same conclusion with regard to this public work was reached by the circuit court of appeals for the sixth circuit, in the case of *Chattanooga & Tennessee River Power Co.* v. *United States*, 209 Fed., 28, 126 C. C. A., 170, affirming the exhaustive opinion of Judge SANFORD in the district court. That controversy arose under an indictment against the power company for violation of the eight hour law (U. S. Comp. St. 1916, sections 8918-8920). The power company sought to treat the work as a private enterprise, primarily for its own benefit, in order to escape the effect of the law mentioned. It was held that the indictment was good on the grounds stated.

So the liability of the plaintiff in error must be measured by that of the United States. While the United States is liable for the taking of private property, and under its laws can be sued therefor, and for the incidental damages connected therewith involved in the taking, that is, the value of the land taken and the incidental damages to the residue of the tract out

of which it is taken, it cannot be sued for mere consequential damages. *United States* v. *Lynah,* 188 U. S., 445, 23 Sup. Ct., 349, 47 L. Ed., 539; *Gibson* v. *U. S.,* 166 U. S., 269, 17 Sup. Ct., 578, 41 L. Ed., 996; *Northern Transportation Co.* v. *Chicago,* 99 U. S., 640, 25 L. Ed., 336; *Scranton* v. *Wheeler,* 179 U. S., 141, 21 Sup. Ct., 48, 45 L. Ed., 126; *Union Bridge Co.* v. *U. S.,* 204 U. S., 364, 27 Sup. Ct., 367, 51 L. Ed., 523. Such injuries as might be suffered from the Anopheles mosquito breeding in the margin of the public waters of the United States, or in ponds created on lands habitually overflowed by it as the necessary result of the use of its public works would be such remote and consequential damages as it would not be liable for, as a part of the exercise of its right of eminent domain.

Furthermore, the incidence of such injuries would result, not so much from the fact of the construction of such a public improvement, as from the management thereof after its creation, since it appears from the evidence that the breeding places might be eradicated by cutting away the bushes and removing the debris on the bank of the river that would furnish shade and act as a means of preventing the wave motion of the water; also as to the pond, that it might be prevented by draining the pond. Of course, it is obvious that this removal of vegetation, and of obstructions, would have to be continued from time to time as the new growths would form between overflows, and new obstructions be deposited by the same agency. The failure to remove such obstructions, if

a ground of action at all to an adjoining owner, would be simply a tort, and the United States cannot be held liable for torts. Moreover, as to the remote and consequential character of such injuries, it is to be observed that it would necessitate inquiries as to whether the proper precautions had been used by adjoining owners in protecting themselves by screening their houses; it appearing from the evidence this is a precaution which tends to prevent the incursion of mosquitoes. The plaintiff in error contracted with the United States under section 3 of the contract quoted supra, that it would save the latter harmless ''on account of any damage to person or property, resulting from the construction of said lock and dam.'' Under this agreement it could be held liable only for such damages as the United States would be liable for.

Furthermore, in respect of what has been said concerning the draining of the pond, it should be observed that although the United States had the right to appropriate the land of McNab for flowage purposes, it did not have the right, without McNab's consent, to go upon that land for a different purpose, that is, to drain the pond from time to time. *Railway Co. v. Telford*, 89 Tenn., 293, 14 S. W., 776. For a stronger reason plaintiff in error, its employee, had no such right. The default then, if any, of the United States, in respect of the matter was its failure to keep the margin of the lake free of shrubs and debris of all kinds, after it took possession of the property.

But it is said that the contractor is responsible in damages where the works erected by him are harmful to others as being dangerous to their health. That is to say, the suggestion is that if the works erected are a nuisance the contractor is not exonerated. This presupposes that public works erected by the United States under authority of Congress can be held a nuisance. This is an incorrect view. We think the true view is stated in Joyce on Nuisances, section 67; that:

"Works of internal improvement which have been erected by the United States for the benefit of its citizens do not become public nuisances from the fact that the neighborhood is thereby rendered unhealthy by the obstruction of running water, and a consequent overflowing upon adjoining land, and the character of such works is not changed by the fact that they are transferred to a private corporation which is required to maintain the same, for the purpose of their creation."

For the same reason it could not be abated as a private nuisance at the suit of an individual. Furthermore, if the government has the right to erect public improvements it has the right to employ servants to do the work, and those servants cannot be sued where they act strictly in the line of their employment, executing the orders of the United States. If the rule were to the contrary, then it would be impossible for the United States to serve the public by the erection of great works of internal improvement for the benefit of all. The assertion is preposterous that a private

citizen could prevent the improvement of navigation by federal authority on the ground that mosquitoes would be bred on the margin of the stream, or in ponds created by necessary overflow. It is equally preposterous to say that the servants of the government, in executing, without negligence, the orders of the government, would be responsible to third parties on the ground that the government works would make the neighborhood unhealthy. In the nature of things the law can afford no relief under such circumstances. The only recourse that a sufferer can have is an application to the sovereign by petition for such amelioration of the hardship as it may choose to grant. 2 Wood on Nuisances (3 Ed.), section 763.

Now to apply the foregoing principles. The lock and dam was a work undertaken by the United States, and carried out through its agent, the plaintiff in error. The latter executed, in good faith, all of the employer's requirements, and was guilty of no negligence. It is not therefore responsible for the river banks and pond where the mosquitoes were bred that caused defendant in error's injury.

The predicate of the present suit is really that the United States so constructed the dam, that is, made it so high, as that in ordinary freshets it backed the water over the land of McNab, creating the pond; that although while these freshets themselves did no harm to defendant in error, yet on the retiring of the water the pond was left and the banks were left, and, these not being cleaned of bushes, and the pond not

being drained, by reason whereof the offensive mosquitoes were bred, the plaintiff in error is liable for the injury suffered, notwithstanding it acted in strict conformity with its employer's specifications and orders in all that was done, and notwithstanding the further fact that the injuries occurred by reason of failure to act on the part of the employer long after the property had passed into its hands, such supposed neglects consisting of the failure to trim off the bushes, and to drain the pond after the latter had come into full possession, and notwithstanding the further fact that this trimming of the bushes would have to be done from time to time as new growths might appear, and that the ditch would have to be reopened from time to time as it would fill up after each overflow. A mere statement of the contention shows how impossible it is to sustain it.

If McNab himself, the owner of the land on which defendant in error lives, were here complaining, he could have no relief, not only for the fundamental reasons already given, but also on the ground that he was fully paid for all injuries done to him and his land. It is true that if defendant in error were a tenant on any part of the land taken, he would be entitled to compensation to the extent that any part of his estate was appropriated. *Colcough* v. *Nashville & N. & W. R. Co.,* 2 Head (39 Tenn.), 171, 176. But no part of the eight acres of which he was a tenant was invaded by the overflow; so no part of it was taken. The

eight acres, as between defendant in error and plaintiff in error and the United States, must be treated as a tract separate from the rest of the McNab tract, of which it was really a part. So the question would be whether, treating the eight acres as a tract adjoining the one taken, the United States would be liable for the consequential damages inflicted by the breeding of mosquitoes on the land taken, by reason of its failure to clean and keep clean the river banks, and to drain and keep drained the pond referred to. That the United States could not be held liable we think has been fully shown. That if it could not be held liable plaintiff in error could not. be held we think has also been shown; and for the further reason that the negligence, if there was any, was, so to speak, the negligence of the United States after it had received and taken charge of and was operating daily the lock and dam.

But it is insisted that the plaintiff in error has an interest in the property, and for that reason should be held liable. It is true it has, during the pleasure of the United States, an easement in the surplus water (that not needed for purposes of navigation), collected in the dam, received by it as compensation for erecting the dam for the benefit of the United States. This fact, however, can in no wise answer the objections already stated. It confers no control over the dam or influence in its operation, and in fact no such control, in whole or in part, exists, and no such influence

C. & T. R. Power Co. v. Lawson.

is exercised by plaintiff in error. This being true, there could be no responsibility, arising from mere ownership of the easement referred to.

It results that the judgment of the court of civil appeals, ordering a peremptory instruction dismissing the action, must be affirmed with costs.