BROWN et al. v. CHICAGO, B. & Q. R. CO.

(District Court, D. Nebraska, Lincoln Division. April 16, 1912.)

No. 26.

WATERS AND WATER COURSES (§ 179*)—OBSTRUCTION OF STREAM—ACTION FOR DAMAGES.

While one who obstructs the natural flow of a stream is liable for damages thereby caused by flooding the lands of another, to entitle the latter to recover, it is not sufficient to prove the obstruction and that there was an overflow; but it must be further shown that the overflow would not have occurred, but for the obstruction, and the extent of the damage resulting from the overflow attributable to the obstruction must be traced.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 244–250, 256–259, 263, 264; Dec. Dig. § 179.*]

At Law. Consolidated actions by Alba Brown, Jr., and others, against the Chicago, Burlington & Quincy Railroad Company. On motion by plaintiffs for new trial. Overruled.

Charles O. Whedon, of Lincoln, Neb., for plaintiffs.
Byron Clark, of Omaha, Neb., for defendant.

THOMAS C. MUNGER, District Judge. These cases were consolidated for the purposes of trial, and a verdict for the defendant

was directed at the conclusion of the evidence. The actions were brought for the loss of crops and the erosion and silting of land, alleged to have resulted from the defendant's negligence in causing the waters of a stream to overflow plaintiffs' lands. Oak creek is a natural stream, arising in several branches about 22 miles above the place where the plaintiffs' injuries occurred. The creek and its tributary branches drain a watershed of about 200 square miles. The upper portion of this watershed is from 6 to 12 miles wide; but it narrows as it approaches the scene of these actions, until it is about 2 or 3 miles wide, and the valley itself, in which water may run even at high flood stage, narrows to less than a mile. In this valley, Oak creek winds in a crooked course, being ordinarily a stream of a few feet in depth and of about 6 to 10 feet in width. Below the scene of the injury the valley widens somewhat, being joined by another stream of less size entering from the west.

The defendant maintains a railway built across the valley of Oak creek, crossing the stream at a station called Woodlawn. The railway across the valley is laid upon an embankment, and this embankment is broken by two bridges, one a pile bridge over a draw about three-fourths of a mile east of Woodlawn, and the other a steel bridge laid across Oak creek. About 200 feet above the steel railway bridge is a dam in the creek, adjacent to a mill. In the years alleged in the petitions, and following heavy rains over the Oak creek watershed, the water filled the channel of the creek, and also covered large portions of the plaintiffs' lands, injuring the crops thereon.

Contour maps offered in evidence show that, when the water overflows the banks of Oak creek at points above the railway embankment and bridge, it first covers the land (except a few narrow ridges on each side of the creek) just north of the embankment, and for a distance about three-fourths of a mile northward. If it were not for the embankment, the water would also cover the space south of the embankment, and it is usually covered at the same time, by reason of the overflow from the stream south of the embankment. When the water north of the embankment rises approximately another foot, it covers the ridges lying on both sides of the creek, and also overflows a large portion of the west half of section 29, lying to the north of the land previously overflowed. A rise of another foot covers a less amount adjacent to the portions before covered. In the floods complained of these portions of land were all submerged. The water, when it overflows the valley to the east, finds a natural outlet through a well-defined draw, which runs under the pile bridge mentioned, and thence flows across the lands of the plaintiff Schweizer in a southwesterly direction, to again join Oak creek.

The specific charges made by the plaintiffs' petitions allege that the defendant about 1906 removed a previously existing pile bridge, which had a waterway 120 feet wide, and substituted a bridge resting upon stone abutments, which reduced the width of the waterway to 65 feet, because of the filling in of the space outside of the abutments, and that the solid steel girder which constitutes the side of the bridge also obstructed the water's flow, when the stream reached to that height. The charge made in the petition is as follows:

"Some time prior to the year 1906 the defendants removed said bridge theretofore constructed and extending across said Oak creek and resting upon said piling driven into the ground, and in lieu and in place of said bridge so resting upon piling the defendants placed another bridge, each end of which rested upon stone or concrete abutments. In the construction of said last-mentioned bridge the sides of the bridge were made of solid iron about 65 or 70 feet in length and about 6 feet in height from the bottom where the ends rested upon the stone abutments to the top of the sides of said bridge, and in the construction of said last-mentioned bridge the said defendants filled up the waterway theretofore existing, which was about 120 feet in length, for the distance of about 55 feet, thereby reducing the waterway along which the water flowed in said Oak creek and passed beneath said bridge to the distance of about 65 feet, and thereby wrongfully and unlawfully obstructed the flow of water in said stream at said bridge by means of the embankments at the ends thereof, so that ever since said last-mentioned bridge was constructed across said stream the flow of water in said stream in times of high water has been obstructed at and by said bridge, and by means of said bridge and embankments the water flowing along said stream, and which but for said embankments would have flowed along said stream and away from the lands occupied by the plaintiff, as hereinafter mentioned, was caused to flow back and over and upon the lands and crops of the plaintiff, as hereinafter described. * * * The water flowing down said Oak creek flowed down to the said bridge hereinbefore mentioned, which was located at or near said station of Woodlawn, and, owing to the waterway theretofore existing being filled up, the water was not able to escape along the natural course of said channel; but being obstructed in its flow by said embankments and bridge, so constructed by the defendants across said Oak creek, and owing to the fact that said defendants had obstructed the said waterway beneath said track at the crossing of said creek by filling up the previously existing waterway, the water flowed back, over and upon the growing crops of the plaintiff, * * * and that said destruction of the plaintiff's crops was solely due and owing to the action of the defendants in filling up the natural water course along and between which the water of said Oak creek flowed, and in putting in an embankment in lieu of the open space provided for the flow of waters by said bridge theretofore constructed upon the piling, and in causing said waters to overflow said crops."

It is plain that the only obstruction complained of in plaintiffs' petitions is that, of the 120 feet of waterway previously existing, 55 feet in width was closed by the abutments of the new bridge, and by the filling in of the embankments back of them, and that the girder of the steel bridge added a further obstruction. No complaint is made of the long railway grade or embankment running three-fourths of a mile east of the bridge to the pile bridge, and west of the steel bridge along the valley; but, although the grade had existed for more than a score of years, the petition alleges the previously existing waterway of 120 feet under the former bridge "afforded ample opportunity for the waters flowing down said stream to pass off without flowing or overflowing" the plaintiffs' lands.

On the motion for a new trial, the sole question is whether the injury that the plaintiffs suffered arose from the act alleged. Mr. Justice Story, in Whipple v. Cumberland Mfg. Co., 2 Story, 661, Fed. Cas. No. 17,516, expressed the rule as to riparian rights in running streams in this way:

"Every riparian proprietor is entitled to have the stream flow in its natural channel, as it has been accustomed to flow, without any obstruction by any mill or riparian proprietor below on the same stream, unless the latter has acquired such a right by long user, or by purchase, or in some other mode, which the law recognizes as conferring a title on him."

195 F.—64

In Atchison v. Peterson, 20 Wall. 507–511, 22 L. Ed. 414, the Supreme Court adopts the following language from Chancellor Kent:

"Every proprietor of lands on the banks of a river," says Kent, "has naturally an equal right to the use of the water which flows in the stream adjacent to his lands, as it was wont to run (currere solebat) without diminution or alteration. No proprietor has a right to use the water to the prejudice of other proprietors above or below him, unless he has a prior right to divert it, or a title to some exclusive enjoyment. He has no property in the water itself, but a simple usufruct while it passes along. 'Aqua currit et debet currere ut currere solebat.' Though he may use the water while it runs over his land as an incident to the land, he cannot unreasonably detain it, or give it another direction,. and he must return it to its ordinary channel when it leaves his estate. Without the consent of the adjoining proprietors he cannot divert or diminish the quantity of the water which would otherwise descend to the proprietors below, nor throw the water back upon the proprietors above without a grant or an uninterrupted enjoyment of 20 years, which is evidence of it. This is the clear and settled doctrine on the subject, and all the difficulty which arises consists in .the application."

The same rule is expressed by the courts of this state. In Kane v. Bowden, 85 Neb. 347, 123 N. W. 94, it is stated as follows:

"Water flowing in a well-defined water course, whether swale or creek, in its primitive condition, may not, except in the exercise of the power of eminent domain, lawfully be diverted and cast upon lands of an adjoining proprietor, where it was not wont to run according to natural drainage."

In Conn et al. v. Chicago, Burlington & Quincy R. R. Co., 88 Neb. 732, 130 N. W. 563, it was said:

"In an action to recover damages for a railway company's alleged negligence in constructing its roadbed, so as to interfere with the drainage of surface water, the jury should be instructed that if the roadbed did not obstruct the natural drains and water courses through which accumulated surface water was wont to flow while the premises were in a state of nature, or if those drains were obstructed by the defendant, so long as it substituted an artifi-. cial way of equal capacity and efficiency, it was not negligent in constructing a solid continuous roadbed for its railway."

See, also, Gould on Waters, § 204.

The care which is required of the lower riparian proprietor is measured by the standard of the natural flow of the stream. The plaintiffs in these cases allege a departure from that standard by the defendant. In order to establish this charge, it was incumbent on the plaintiffs, not only to prove the existence of a flood arising from the waters of the stream, but also that the flood was a departure from what would have resulted if the stream had flowed in its natural course.

That there was an overflow from the creek, and that it was caused by the narrowing of the stream at the bridge, does not suffice to establish the cause of the plaintiffs' injuries. Those injuries might have resulted from these floods, if no bridge had ever been erected at Woodlawn. It is a well-known fact that the valleys of many streams in this region are frequently inundated, and that such floods occur at places where there are no artificial obstructions. The valleys of the Mississippi, the Missouri, the Kaw, and the Platte were subject to overflows before natural conditions were changed, and so were the valleys of many of the lesser tributaries of these rivers. It is shown by the evi-

dence that both the channel and the valley of Oak creek have a very slight fall in the vicinity of Woodlawn, and that the flood waters of the creek often overspread the valley above and below Woodlawn, at places where no obstructions have been made. It was incumbent on the plaintiffs to show that their injuries would not have been suffered, had there been no obstruction, and the creek had flowed as it was wont to do, in its natural channel. The extent of the rainfall, the length of time in which it fell, the natural conformation and decline of the stream and of the valley, the carrying power of the stream, and the experience with other similar rainfalls under similar conditions, afford a basis for comparison between the effect of the natural flow under such circumstances and the effect of the floods in question. No evidence was given to show the capacity of the natural water course to care for floods like those in controversy, and for all that appears the plaintiffs' crops might have been inundated practically to the same extent, or at least damaged to the same extent, by a lesser inundation, had no bridge ever been built across the creek at Woodlawn.

That there would have been some inundation of plaintiffs' lands, if the defendant's bridge had not been built, seems obvious from the fact that the land immediately below the bridge and embankment was covered to a very large extent at the same times, and from the further fact that lands many miles to the north of the embankment and bridge, and beyond their influence, were likewise flooded. At all events, it was the plaintiffs' duty to show what they alleged; that is, that the damage done arose from the alleged obstruction.

There was no evidence to go to the jury tending to show the standard of legal comparison by which these floods were to be measured. It was left to conjecture whether a similar flood, under similar circumstances, would have covered plaintiffs' lands, or portions of them, and to what length of time it would have remained, had the waterway been 120 feet wide, as plaintiffs alleged it had formerly been, or had it been the width that nature had provided. The fact that the water was dammed up behind the bridge girder and the railway embankments flanking the bridge does not show that otherwise it would not have been over the land deep enough, and for sufficient time, to have destroyed the plaintiffs' crops and to have done the other injuries complained of. Such obstruction of the water does tend to show that to the extent of the excess of height of the water north of the embankment and bridge over that below them, and over the area reached only by this excess, an effect was traced to the embankment and bridge. It is said that the contour maps enable the jury to ascertain the amount of land thus affected by the height of the water against the bridge girder, and to that extent the plaintiffs made a prima facie case. This would be conceded, if the bridge girder were the only obstruction raising the water to that height; but the evidence shows that the railway embankment for a long distance on either side of the bridge was of the same height that the water rose upon the girder. As no complaint was made of this railway embankment, and no evidence was offered to show the extent to which the water was retarded

by the girder alone, the jury had no basis by which to determine what amount of water it backed upon plaintiffs' lands.

· · There was evidence, also, that water backed up certain draws, and then spread out over lands of some of the plaintiffs; but the first would also have happened if no bridge had been built at Woodlawn, provided the water filled the creek bed to the top of the banks, and the second would have occurred if the flood overflowed the creek banks near Woodlawn, so that no aid is given in determining whether this overflow was caused by the bridge or by a natural freshet. Similar questions to the one presented here have frequently been before the courts. In Morris v. Receivers of Richmond & D. R. Co. (C. C.) 65 Fed. 584, 585, it was said:

. "In the case at bar it is a non sequitur to assume that, because there was a railroad embankment below the place of damage by which the flow of the water of the freshet was obstructed, therefore the damage to plaintiff's tobacco was caused by the obstruction. It is not enough to prove the obstruction and stop there. Something more must be proved. Damages from freshets so frequently occur on streams in which there are no dams below the places of damage that the courts are bound to take judicial notice of the fact. Where damage occurs during the coincident existence of a freshet and an obstruction, it must be affirmatively proved that, if there had been no obstruction, there would have been no damage. It is of common knowledge that damage is produced by freshets, where there are no dams or other obstructions to the waters of streams below the places of the damage."

In Treichel v. Great Northern Ry. Co., 80 Minn. 96–101, 82 N. W. 1110, 1112, in reversing a judgment in favor of the plaintiff, the court said:

"It is conceded that defendant would be liable for damages resulting from its obstruction of the creek; but who can tell from the record whether this was the cause? Water was everywhere. No data is furnished as to the extent of the water back of and beyond plaintiff's land, which had to pass out through this coulee. There is no evidence as to the amount of water that could pass through in any given time, as compared with the water to pass through, or how much longer it would take. Other water courses and culverts may have been obstructed, throwing water back to this stream which would not naturally flow there. Damages cannot be predicated upon conjecture and mere speculation. From all the evidence in the case, we are forced to the conclusion that plaintiff has not shown that the acts charged are the proximate cause of the injuries alleged."

. See, also, Karchner v. Pennsylvania R. Co., 218 Pa. 309, 67 Atl. 644; Oakley v. Neese, 54 Ga. 459; Texas & P. Ry. Co. v. Padgett, 14 Tex. Civ. App. 435, 37 S. W. 92; Kansas City, M. & B. R. Co. v. Smith, 72 Miss. 677, 17 South. 78, 27 L. R. A. 762, 48 Am. St. Rep. 579.

·· Summing up the principles applied in these decisions, it may be stated that in an action of this kind it is not sufficient to prove an obstruction of a stream, and that such obstruction contributes to causing an overflow and an injury; but the amount of overflow and damage which is caused by such obstruction must be traced. Ordinarily this requires that a comparison be made by evidence as to what overflow and injury would have existed in the course of nature under similar circumstances if there had been no obstruction, and only for the

differences between the results is the one causing the obstruction liable.

As there was no evidence from which the jury in these cases could have made this comparison, the verdicts were properly instructed for the defendant, and new trials are denied.