THOMAS W. EVANS v. MASSMAN CONSTRUCTION COMPANY, a Corporation, Appellant.—122 S. W. (2d) 924.

Division One, December 20, 1938.

*Garrett & Ruark, Walter A. Raymond* and *Hume & Raymond* for appellant.

634

*Henderson & Deacy* and *Prince & Beery* for respondent.

636

LUCAS, J.—The plaintiff had judgment in the Circuit Court of Kansas City and the defendant appealed to the Kansas City Court of Appeals. The opinion of that court is reported in 115 S. W. (2d) 163. One of the judges of said court dissented and certified the cause to this court.

Plaintiff was a farmer in Carroll County and the defendant was a contractor engaged in constructing dikes in the Missouri River pursuant to contracts made between the government and the defendant. Pursuant to authority duly vested, the United States engineers designed a plan for the improvement of navigation of the Missouri River between Kansas City and the mouth of the river. Pursuant to authority vested in the United States engineers to carry out said plans, a contract dated December 22, 1930, was made between the government (through its contracting agency) and the defendant whereby the defendant was to construct certain dikes in the Missouri River near Sheep's Nose and Berlin Bend as well as to perform other work in said vicinity. There is no dispute about the validity of the contract between the parties. The contract was known as a contract for Standard Pile Clump Dikes, Standard Crib Dikes and Standard Revetment and the contract was worth $461,023.47. The contracting officer for the government was Theodore Wyman, Jr., Captain of Corps of Engineers. He was the same person who had designed the proposed improvements of the river at this point. The contract, among many other things, provided for the construction of about 8180 linear feet of standard pile clump dikes and said dikes were to be constructed by the contractor in accordance with specifications and drawings prepared and furnished by the government. The contract provided that the government (contracting officer) could at any time by written order make changes in the drawings or specifications and that if such changes increased or decreased the amount due under the contract that adjustment shall be made and the contract modified in writing accordingly; that any change increasing or decreasing the contract $500 or more must be in writing and approved by the head of the department and adjustments under said changes shall be determined as provided by the contract but that the contractor must proceed with the prosecution of the work regardless of the changes. The contract provided for complete inspection on the part of the government of all material and workmanship and provided that government inspectors should at all times be permitted to inspect and test the materials and work as the project progressed. The contract provided for its completion in 174 calendar days. The contract provided for monthly payments to the contractor, for all

work that had been completed satisfactorily and upon which estimates had been approved by' the contracting officer.

The contract was a standard form contract used by the government at that time for river work and the specifications accompanying said contract, as a part of it, were prepared by the United States Engineering Corps with offices in Kansas City, Missouri, at the time this work was planned and constructed. The construction of the dikes called for in this contract was controlled by the plans and specifications. Accompanying the contract and in connection with' the plans and specifications were maps and drawings showing the approximate location and approximate size of the dikes to be constructed. The specifications, paragraph 1, read: "The pile clump dikes shall have the *approximate* unit lengths indicated on the map referred to in paragraph 27. . . ." Paragraph 2 reads: "It is the spirit and intent of these specifications and plans to secure for the United States, the work described, complete in every respect, and the general conditions thereof shall be complied with, *whether items are specifically mentioned or not.* The specifications give *in general,* the character of work required, the dimensions, method of construction and materials to be used." Paragraph 5 of the specifications provided that the contractor could not work when climatic conditions were unfavorable and that if conditions were considered unfavorable by the contracting officer then the prosecution of the work should be suspended until more favorable conditions occurred and that the contracting officer would determine what conditions were favorable or unfavorable for working. The specifications estimated the quantities of material for lumber or willow mattress, ballast, piles and stringers; the specifications reserved to the government the right to vary the centers of the dikes, *to increase up to 50% or decrease up · to 30% the total length of the dikes,* that in case of increase in the amount of work for pile clump dikes or crib dikes or revetment the time limit will' be extended proportionately. Paragraph 13 provided for proper inspection by the government and for the making of all *necessary measurements* and to insure compliance with the terms of the contract, that government inspectors shall be given access to the work at all times; that the government inspectors will measure and record the work done daily. Paragraph 15 of the specifications provided that the dikes should be constructed during the early working season of 1931, *and when and as directed by the contracting officer*; that the contracting officer reserves the right to change the order of work as stated above. The location, elevation, low water datum line and *limits of the work* will' be plainly indicated by the contracting officer or his agents, by stakes, ranges or otherwise. Paragraph 34 reads as follows: "The right is reserved to make such changes in the execution of the work to be done under these specifications as

in the judgment of the contracting officer may be necessary or expedient to carry out the intent of the contract, provided that the unit cost to the contractor of doing the work shall not be increased thereby; and no increase in unit price over the contract rate will be paid to the contractor on account of such changes. No change which will materially affect the cost of doing the work will be made, and no greater or lesser unit price than the contract rate will be paid, except upon formal written agreement between the parties, as provided in the form of contract to be entered into."

Defendant performed said contract, and dike known as 314.1, was located opposite the Carroll-Ray County line and was the longest of the dikes constructed. It was built from the south bank of the river. This lawsuit grows out of alleged negligence on the part of the defendant in the construction of said dike 314.1.

Plaintiff in his petition charges the defendant with general negligence in that the defendant "negligently constructed and erected and/or lengthened or elongated in said river at a place south of and adjacent to levee district No. 2 in Ray and Carroll Counties, certain dikes, revetments and matting in such manner and way as to narrow and compress the stream of said river into an area insufficient to permit the movement of said waters within the banks of said river. That the natural movement of the waters in said river at said point was thereby greatly obstructed and retarded and said waters at the west of said artificial obstructions accumulated on or about June 21, 1932, in such a way as to heighten the surface of said river at said point. That this drove said waters against, upon and over the above mentioned levee, washing the same away and causing thousands of acres of crop-laden land in said levee district to be overflowed, etc."

The defendant by its answer, denied the allegations and further answering stated that the work which defendant did at said dike was done under the direction and supervision of the United States in accordance with the plans, specifications and contract existing between the government and the defendant and that the defendant was therefore immune from any damages that resulted to plaintiff and that the work done by defendant had been fully approved by the government and had been accepted and paid for by the government. The reply was general denial of new matters contained in defendant's answer.

There was no dispute about the contractual relationship between the defendant and the government and this record shows that there had been no dispute between the contracting parties about the performance of the contract. The government had inspected and supervised the work as it progressed and the government had accepted the work and fully paid the defendant for it. The defendant had built the dike in question (314.1) exactly where the government engineers

had directed it to be built. The evidence showed that this dike in question was the longest of a series of dikes which had been constructed along the river in this vicinity and that some of the dikes had been constructed by the government itself and some of them under contract. The evidence showed this dike in question was 2.87 miles downstream from the point where the levee of levee district No. 2 broke and thereby let the floodwater into levee district No. 2 and that the water got as deep as 8 feet over lands within said levee district.

Plaintiff offered evidence under his petition tending to establish that defendant was negligent in the performance of its contract with the government in that, (1) defendant extended dike 314.1 too far into the river, that is, that defendant built the dike too close to the north bank of the Missouri River (said dike having started from the south bank). The contract and specifications do not provide for the length of this dike but plaintiff showed that there was a departmental order issued by the engineer in charge to his inferiors ordering the channel of the river to remain at least 200 feet in width and plaintiff contends that knowledge of this order was conveyed to defendant that defendant violated that order and that violation of the order resulted in the extension of the dike too near the north bank of the river and choked the river at that point to less than 200 feet.

The next charge of negligence is that defendant placed a so-called screen or fender mat on the upstream side of this dike. That said mat was lattice-like in nature and consisted of boards woven together in such form as to leave openings of only four inches between the boards and that this was set from the bottom of the river up to a point two feet above the mean low water line and on the upstream side of the dike and that said mat was not called for in the plans or specifications and was not ordered in writing to be inserted at this dike and that therefore the defendant was negligent in putting the mat on this dike. Plaintiff claims that these two acts of negligence on the part of defendant resulted in the damage to plaintiff because this dike in its then condition caused the water coming down the river to pile up or accumulate at said dike and to back the water up the river to the extent that the river became so full above this dike and the pressure became so great at the point where the levee of levee district No. 2 broke that this break in the levee was caused thereby.

To prove his allegations the plaintiff produced several witnesses who testified that the north end of the dike was extended to a point from 100 feet to 175 feet from the north bank of the river, and some of the witnesses testified they had worked on the screen or fender mat and saw it put in the river for the full length of the dike. There

was no dispute but that plaintiff's farm was overflowed and damaged.

At the point where dike 314.1 was constructed the river ran practically east and west and it was the purpose of the government to build this dike at this point in order to deepen the channel along the north side of the river and cut away some of the north bank of the river at that point. It was conceded that the purpose of all of the river work in this vicinity was for the purpose of deepening the channel and improving the river for navigation. It was admitted that levee district No. 2 owned a dirt levee along the north side of the Missouri River and that said levee was for the purpose of keeping the Missouri River water from the lands inside the levee district. This levee extended on east of dike 314.1 and it extended west of said dike approximately 2½ miles along the river and then the levee turned northwestwardly and ran along the east side of Crooked River which river emptied into the Missouri River at a point a short distance west of said levee. The evidence showed that during the few years preceding this 1932 levee break that the government had constructed, either by contract or by itself, about 8 dikes on the north side of the Missouri River and west of the levee, as well as west of the junction of Crooked River and the Missouri River, and that the government had constructed 6 dikes on the south side of the Missouri River west of these points above mentioned. That the construction of these dikes west of this point was to deepen the channel of the Missouri River along the north bank near where Crooked River flowed into the Missouri. The evidence showed that the distance from the junction of Crooked River and the Missouri River and the levees break downstream to dike 314.1 was 2.87 miles and that between these two points there had been constructed 16 dikes, 8 of them being on the south side of the river. The evidence further showed that the June rise in 1932 was an abnormal rise. It was shown that levee district No. 2 had constructed the levee in question about the year 1911, that it was a dirt and sand levee, that it had not been rebuilt at any time since its original construction and that said levee was not sufficient to prevent seep water from entering the levee district when the Missouri River was high. All of the dikes mentioned above had been completely installed prior to the construction of dike 314.1. The purpose of dike 314.1 was to drive the channel to the north side of the river and deepen the channel there and also to erode or cut away a portion of the north bank of the river at this point.

The defendant offered evidence to the effect that dike 314.1 was never constructed at any time to within a point of less than 200 feet of the north bank of the river and also offered evidence denying the use of a screen or fender mat except for a distance of 707 feet out

from the south bank of the river. Defendant's evidence tended to show that 216 feet off of the north end of dike 314.1 was destroyed by the flood at least three days before the levee broke and that the north bank of the river opposite the dike had eroded approximately 186 feet before the levee break occurred; that the river was so high that the water was 9 feet over the top of the fender mat or screen that·was used. Defendant's evidence by the government engineers tended to establish that the construction of dike 314.1 was in strict conformance with the contract, specifications, orders and directions of the government and that all work done in constructing said dike had been approved, accepted and paid for by the government; that government inspectors were on the job all the time and they directed the employees of defendant where, when and how to drive the piles and when to stop the lengthening of the dike; that the choking or retarding of the flow of water in the river at this dike could not and would not affect the height or level of the water at the point where the levee broke; that the construction of dikes in the river was so planned and arranged that any retardation of water flow at one dike is completely annihilated at the next dike upstream; that dikes are constructed for the purpose of retarding water flow slightly and for diverting the current from one portion of the river to another. Defendant's evidence further tended to show that the levee was old and weak; that the flood on June 22, 1932, was a very abnormal flood; that the dikes between the levee break and dike 314.1 had similar effect on the flow of the water as did dike 314.1; that the dikes above the levee break had some effect on throwing the water to the north side of the river at a point near the levee break; that work on dike 314.1 was stopped May 6, 1932, because the north end of the dike was nearing the 200 foot limit from the north bank of the river.

So much for the contention of the parties and for disputed matters in evidence. We now come to the consideration of these contentions and the evidence for and against the contentions of the respective parties.

The trial court submitted the case to the jury and a verdict for plaintiff resulted. It is interesting to note that this case has been tried twice below and each time a three-fourths verdict has been returned for the plaintiff.

The defendant brings this case here on two principal points. The first is that the plaintiff did not make a submissible case in that the evidence for the plaintiff, when most favorably considered for the plaintiff, wholly fails to show that the negligence of the defendant (even if admitted) is the proximate cause of plaintiff's injury, and second, that the defendant is immune from consequential damages resulting to plaintiff because of this river work for the reason that

defendant was acting as the agent of the government and that the government would not have been liable to plaintiff even though negligent and that therefore the defendant enjoys the same exemption.

■ We will consider the first complaint and due to our view on this question it will be unnecessary for us to consider the same complaint. We are of the opinion that the plaintiff failed to make a submissible case and for that reason the verdict and judgment below cannot stand and the case will be reversed.

This court will never interfere with a verdict when there is any substantial evidence to support it, or when there may be reasonable inferences drawn from substantial evidence that would support the verdict. But on the other hand, this court will not permit a verdict to stand when there is no substantial evidence to support it, or no substantial evidence to support inferences that would support the verdict. This is one of the latter cases. It is conceded that plaintiff was damaged and there is sufficient evidence in the case to go to the jury on the question of narrowing the channel to less than 200 feet at the north end of dike 314.1 and of the use of a fender mat on this dike. But even that is not enough to justify the verdict for plaintiff because there is no substantial evidence or proof to support the principal elements that plaintiff must prove in this suit, that is, that the negligence alleged and proved was the negligence of defendant and that such negligence was the real or proximate cause of plaintiff's injury. ■ This record will not protect plaintiff's verdict. In order for plaintiff to recover he must prove three things, (1) that he was injured, (2) that defendant was negligent, (3) that defendant's negligence was the proximate cause of the injury. [Shaw v. Goldman, 116 Mo. App. 332, 92 S. W. 165; Coble v. St. Louis-San Francisco Ry. Co. (Mo.), 38 S. W. (2d) 1031.] Failure to prove either one of these elements by substantial evidence is fatal to plaintiff's verdict. This court is not passing upon the credibility or weight of the evidence, but it is passing upon the sufficiency of the evidence offered in support of the three necessary elements in a case of this nature. Under the contract the United States engineers or inspectors directed the contractor how far out in the river to build the dike and when to stop constructing it, and the contractor under his written contract with the government had to keep constructing the dike toward the north bank of the river until the government engineers or inspectors stopped him. The contractor could not do otherwise. [Compagnie Du Port de Rio de Janeiro v. Mead Morrison Mfg. Co., 19 Fed. (2d) 163; Hausgen v. Elsberry Drainage District (Mo. App.), 245 S. W. 401.] Same case on certiorari, 298 Mo. 448. 250 S. W. 905. There is no evidence at all in this case that the defendant extended the dike in question beyond the point designated by the United States engineers and government inspectors. The contract, par. 34 (Modifi-

cations) and Art. 3 (Changes) authorized the government to make changes in the specifications and in the execution of the work. Therefore, even though no screen or fender mat was specifically provided for in this contract as written, yet since such a mat was put on this dike and accepted and paid for by the government, the evidence discloses that the government either ordered and directed the screen mat to be put there before it was actually placed there, or that the government approved its installation afterwards by inspecting, accepting and paying for it. In either instance, the placing of the screen mat was not done in violation of the contract between the government and the defendant. [Crisp County, Georgia, et al. v. S. J. Groves & Sons Co., 73 Fed. (2d) 327; City of St. Louis v. Ruecking, 232 Mo. 325, 134 S. W. 657.] There is no evidence at all tending to prove that the defendant was in any way negligent in the actual construction or installation of the screen mat. Therefore, whatever effect the length of the dike or the screen mat had on the water of the river at this dike or above or below it was not chargeable to the defendant but was a matter for which the government alone is answerable. [United States v. Spearin, 248 U. S. 132, 39 Sup. Ct. 59; Chattanooga & Tennessee River Power Co. v. Lawson, 139 Tenn. 354, 201 S. W. 165; Ryan v. C., B. & Q. Railroad Co., 59 Fed. (2d) 137; Nelson v. McKenzie-Hague (Minn.), 256 N. W. 96.]

The government had a right to improve the river and the government had a right to hire somebody to do the work for it and any errors or mistakes made by the government in the plans or in the direction of the work to be done by the defendant thereunder cannot afford a basis for plaintiff's recovery from the defendant. [Salliotte v. King Bridge Co., 122 Fed. 378 (6th Circuit); Bedford v. United States, 192 U. S. 217.] The defendant took the plans as handed to him and proceeded to execute them under the direction of the United States engineers, which he did to the total satisfaction of the government and the government paid him in full for his contract. We, therefore, conclude that there was a total failure of any substantial evidence in the case from which a jury could find negligence on the part of the defendant in the performance of his contract with the government and that the plaintiff, therefore, failed to carry the burden of proving an essential element of his case.

Another burden cast upon plaintiff was to prove that the negligence on the part of the defendant, if any, was the proximate cause of his damage. Unless the negligence charged (the narrowing of the channel at dike 314.1 and the installation of the fender mat) was the proximate cause of his damage, plaintiff must fail. Let us examine the evidence from this viewpoint. It is admitted that the purpose of dikes is to change the current of the river and to deepen the channel and that dikes will retard the flow of the water. That is

just what was being done here and there were about 25 dikes within the vicinity of the levee break and dike 314.1 and all of said dikes had been constructed to accomplish this purpose. This program of the government in this vicinity necessarily caused a choking of the river in this sector and when the June rise came the water went through this old levee and inflicted damage on plaintiff and other people. But can you say that what defendant did at dike 314.1 was the proximate or immediate cause of this damage? ██ This is not a case of concurrent negligence because the government is not liable to plaintiff for anything that it did and the defendant is not chargeable with any negligence or bad planning on the part of the government, so the question here is simply one of singular negligence, and unless the evidence shows that defendant's negligence is responsible for the damage, then defendant must be released. It is not at all similar to the cases where two parties are negligent in causing a damage and in which event either or both of the tort-feasors are liable to the injured party. Here we must interpret the evidence strictly with the view that defendant, and defendant alone, is liable for this injury. The evidence offered by the plaintiff is all exceedingly weak and most of it is purely guesswork and opinion, while the evidence of the defendant for the most part is factual in that it is based upon measurements and official records of the government and is given by witnesses whose duty it was to see that the defendant properly executed the contract. We must not weigh the evidence but we must consider its sufficiency in order to determine whether or not plaintiff established a causal connection between the alleged negligence and the damage. The evidence conclusively showed that the water was very high at this dike and was running over the dike and in order to determine whether or not the obstruction afforded by the dike would raise the water level at a point nearly three miles upstream sufficiently to break the levee would certainly be a matter for the most expert of experts. [Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950; Kimmie v. Terminal Railroad Association of St. Louis, 334 Mo. 596, 66 S. W. (2d) 561.] There are so many facts to be taken into consideration, such as the fall of the river, the effect of the various dikes in this vicinity, the effect of the speed of the water at the dike in question, the cutting power of the water opposite the end of the dike in question, the performance of the water at the bottom of the river at various points between the dike and the levee break, the efficiency and strength of the levee itself, and many similar questions, knowledge of which nobody had at the time and knowledge of which would be impossible to obtain except by very close inspection and observation. It was the duty of plaintiff to supply evidence from which a jury could intelligently determine the relation between the dike in question and the damage to plaintiff.

The government engineers did testify that dike 314.1 could not have any effect on the water level at the point of the break in the levee. They were the nearest to expert witnesses offered in the case. The evidence offered by plaintiff was wholly insufficint to afford the jury any guidepost for determining the effect, if any, of dike 314.1 on the levee. The plaintiff's evidence showed that water piled up at the dike and that the water was higher on the upstream side of the dike than below it, that the river was at flood stage and out of banks, but that evidence was wholly insufficient to enlighten the jury as to the actual effect of the dike on the levee at the point of the break because there was no evidence at all tending to show that the presence of the other 16 dikes between dike 314.1 and the levee break would not have some effect on the condition of the water level between these two points. Again the evidence showed that the river was out of banks and the flood water was running up against the levee for the entire distance between the point where the levee broke and dike 314.1, but the levee did not break any place near the dike but that the break occurred 2.87 miles away from the dike and in that portion of the levee that did not parallel the river but at a point where the levee turned northwestwardly from the Missouri River and ran along the east side of Crooked River and that there were several dikes opposite this point and that said dikes were for the purpose of diverting the current of the river over toward the levee near the point where it broke. No evidence was offered to inform the jury that these other dikes would not have some effect on the water at the point of the levee break. There was evidence in the case to the effect that all of these dikes would divert the current of the river and would retard the flow to some extent. The burden was on plaintiff to prove by some substantial evidence that the alleged condition of dike 314.1 was the proximate cause or one of the proximate causes of the levee break. Plaintiff failed in that respect. Instead plaintiff offered only general information to the jury as to water conditions around dike 314.1 and the vicinity near the levee break and left it to the jury to draw its own conclusions as to what effect dike 314.1 had upon the levee. The jury was wholly inexperienced in such matters and this was a matter about which men of ordinary experience know little or nothing and the evidence produced did not take the question of causal connection between the dike in question and the levee break out of the realm of conjecture and speculation, but on the other hand permitted the jury to speculate and guess at the cause of the break in the levee. When the negligence charged is at best a very remote cause of an injury (such as in this case), it is the duty of the plaintiff to produce substantial evidence to the jury connecting the negligence charged with the injury, and if such evidence cannot be produced or is not produced, then the

case falls within that class of cases where verdicts for plaintiffs cannot stand because such verdicts are the results of conjecture, speculation and guesswork on the part of the jury and are not based upon substantial evidence.

The definition of the term "proximate cause" is well-stated in Kennedy v. Independent Quarry & Construction Co., 316 Mo. 782, 291 S. W. 475, l. c. 481, and the cases there cited, as follows: "The proximate cause of an event is that which, in a natural and continuous sequence, unbroken by any new cause, produces the event and without which the event would not have occurred." Under the circumstances shown, we conclude that the essential failure of the plaintiff's case is that there was no evidence at all which tended to show that the break in the levee would not or could not have occurred even though dike 314.1 had not been built at all. If the levee would have broken even though dike 314.1 had not been built at all, then certainly defendant would not be liable to plaintiff and until plaintiff offers some evidence tending to show that the break would not have happened unless dike 314.1 had been constructed as alleged, then plaintiff has failed to show any causal connection between the dike and the levee break.

Plaintiff relies on such authorities as: State ex rel. Blythe v. Trimble, 302 Mo. 699, 258 S. W. 1013; Brash v. City of St. Louis, 161 Mo. 433, 61 S. W. 808; Bishop on Noncontract Law, section 573; 1 Shearman & Redfield on Negligence (5 Ed.), section 39, which state:

"The general doctrine on the question in issue on the instructions is thus stated in 1 Shearman & Redfield on Negligence (5 Ed.), section 39: 'It is universally agreed that if the damage is caused by the concurring force of the defendant's negligence and some other force for which he is not responsible, including "the act of God," or superhuman force intervening, the defendant is nevertheless responsible, if his negligence is one of the proximate causes of the damage, within the definition already given. It is also agreed that if the negligence of the defendant concurs with the other cause of the injury in point of time and place, or otherwise so directly contributes to the plaintiff's damage, that it is reasonably certain that the other cause alone would not have sufficed to produce it, the defendant is liable, notwithstanding he may not have anticipated the interference of the superior force, which concurring with his own negligence produced the damage. But if the superior force would have produced the same damage whether the defendant had been negligent or not, his negligence is not deemed the cause of the injury.' "

But these authorities do not rule the facts of this case, because there is no substantial evidence that any negligence of the defendant (which could have been one of the proximate causes) concurred with any other force to produce the damage to plaintiff. As hereto-

fore stated in this opinion, the acts of the government in constructing this dike and other dikes even though a damage resulted to plaintiff therefrom, are not actionable, and there was no evidence offered to show that the damage to plaintiff would not have resulted from the other dikes or from the flood alone.

Neither does this case fall under the cases of proximate cause such as Strayer v. Quincy, O. & K. C. Railroad Co., 170 Mo. App. 514, 156 S. W. 732; Powell v. Walker, 195 Mo. App. 150, 185 S. W. 532; Northern v. Chesapeake & Gulf Fisheries Co., 320 Mo. 1011, 8 S. W. (2d) 982; McCloskey v. Salveter & Stewart Investment Co., 317 Mo. 1156, 298 S. W. 226; because there was no evidence that the negligence charged to the defendant set in motion a train of events or chain of circumstances leading to plaintiff's damage without the intervention of force of an independent cause. There was no evidence that the dike in question aided in the retardation of the water sufficiently to have caused plaintiff's damage without the contributing obstruction of the water afforded by the other dikes.

The facts of this case on the question of proximate cause are covered by the law as declared in cases such as: Coble v. St. Louis-San Francisco Ry. Co., supra, l. c. 1036, where it is said:

"A correct statement of the law in this respect is found in Byerly v. L., P. & Ice Co., 130 Mo. App. 593, 109 S. W. 1065, 1067, where the court said: 'The rule is elemental that the burden remains with plaintiff to the end of the case to establish by proof, not only the fact of the negligence averred, but also to show a direct connection between such negligence and the injury. Where the ultimate fact is not susceptible of direct proof, its existence must directly follow as a reasonable conclusion from its basic facts and circumstances, and it may be stated as an axiomatic rule that whenever court or jury are left by the evidence in a situation where, in order to find the ultimate fact alleged, they must piece out the facts adduced with conjecture or supposition, the plaintiff must be held to have failed in his proof.'

"This is quoted with approval in Kane v. Railroad, 251 Mo. 13, 29, 157 S. W. 644, in which case many authorities are reviewed, and it is pointed out that the test of whether there is a causal connection between the alleged negligence and the injury is that the facts show that, absent the negligent act, the injury would not have occurred. Who can say in this case that the facts show that, if the fellow servant Huston had not lifted his end of the tie before plaintiff was ready to lift his end, the side ties would not have started to roll down? There is no need of quoting from or even citing the many cases along this line, as plaintiff admits the law to be as defendant contends. Those not so learned in the law might consult. . . ." (Citing cases.)

In Cole v. Uhlmann Grain Co., 340 Mo. 277, 100 S. W. (2d) 311, l. c. 317, this court, in a well-reasoned opinion by HYDE, C., said:

"In considering this matter, we recognize the rule that, where the evidence shows that the occurrence which caused plaintiff's injury may have resulted from two or more causes, in order to hold defendant liable, plaintiff must have substantial evidence tending to show that the cause for which defendant would be liable was the actual cause thereof. (Citing cases.) 'Whether the evidence in a given case is sufficient to support the finding of the jury, when taken and considered in the fashion in which it must be on demurrer, depends on whether it is sufficient to establish with reasonable certainty in the minds of persons of ordinary and average intelligence the existence of the facts on which the finding is necessarily based.' '" (Citing cases.)

In Hamilton v. St. Louis-San Francisco Ry. Co., 318 Mo. 123, 300 S. W. 787, this court, speaking through HENWOOD, C., in a case where the railroad company was charged with permitting a waterspout to hang out over the track and that •a brakeman was found dead on a trestle some distance from the waterspout and it was charged that defendant's negligence with reference to the waterspout caused the death of the brakeman but the brakeman was found dead on a trestle and there was no evidence that he was ever hit by the waterspout and, in denying the plaintiff's claim, the court said (l. c. 792):

"In our opinion, the bridge is the telltale of this accident. The shoe nail prints and rubbed place on the paint of the ladder post and blood spots on the truss rods or stringers of the bridge and the narrow space between the cab windows of the engine and the side of the bridge, together with other physical facts, tend to establish with reasonable certainty that Fanger was struck by the bridge and not the waterspout. Plaintiff's contention that the evidence is sufficient to justify the jury in finding 'that he was struck by the spout and injured, or at least dazed, and that he was knocked off or fell off the engine at the bridge about the time the cab windows were broken,' involves the wildest sort of speculation. Juries are not permitted to exercise their imagination in reaching verdicts. And this calls to our attention the application of another familiar rule, which is decisive of this question. It is very clearly stated by this court in the case of Warner v. Railway Co., 178 Mo. 125, 134, 77 S. W. 67, 70, as follows:

" 'If the injury may have resulted from one of two causes, for one of which and not the other, the defendant is liable, the plaintiff must show with reasonable certainty that the cause for which the defendant is liable •produced the result, and if the evidence leaves it to conjecture, the plaintiff must fail in his action.' '" (Citing cases.)

The St. Louis Court of Appeals in Bennett v. Harry Benjamin Equipment Company, 214 S. W. 244, l. c. 245, in denying a plaintiff, said:

"It is argued for respondent, in effect, that a reasonably prudent person would know that a piece of rounded boiler iron would roll or slip from a pile of that character. As to this it may be said that the evidence is that the boiler iron did not roll by reason of its curved shape, but that it slipped longitudinally to the north, causing plaintiff's injury. What caused it to so slip in no manner appears. For aught that appears the slipping thereof may have been caused by the manner in which it was handled by plaintiff and his colaborers, or the position in which they placed it upon the pile. The cause of the slipping of the boiler iron is left, by the evidence, wholly to speculation and conjecture. And to get to the jury it devolved upon plaintiff to get his case out of the realm of speculation and conjecture and plant upon a solid basis of fact such as to establish, prima facie, actionable negligence on the part of defendant. [See McGee v. Railroad, 214 Mo. 530, 114 S. W. 33; Battles v. Railways Co., 178 Mo. App. 596, 161 S. W. 614.]"

In De Moss v. Kansas City Rys. Co., 296 Mo. 526, 246 S. W. 566, Judge Blair, speaking for this court, in reversing a plaintiff's judgment, had this to say, l. c. 567:

" 'Although a defendant may be negligent in the performance of some duty owed to the person injured, no liability attaches unless such negligent act was the proximate cause of the injury.' 29 Cyc. 488; Stepp v. Railway Co., 85 Mo. l. c. 233. 'If the injury could not have been reasonably anticipated as the probable result of the act of negligence, such act is either remote or no cause of injury.' [29 Cyc. 495; Daneschocky v. Sieble, 195 Mo. App. 470, 193 S. W. 966.]"

The above cases clearly state the law as applied to facts similar to the facts in the instant case and such cases are controlling on us in this case.

Similar sets of facts have been before courts of other states and these courts have reached the same conclusion on those facts as we have reached in this case. The Supreme Court of Kansas in Arnold v. Hoffman & Son Milling Co., 143 Pac. 413, l. c. 414, said:

"It follows that if it appears that the action of the milling company did not contribute to the injury of which the appellant complains and was not the proximate cause of the loss, the ruling of the court in sustaining the demurrer to his evidence must be sustained. The dam of the milling company was a high one, and appears to have been raised from time to time so as greatly to obstruct the flow of the stream, and at times has operated to throw the water back on the adjoining lands above the dam. The fact, however, that the

dam may have been built to an unauthorized height, or that it may have caused an overflow on the lands of some riparian owners, will not avail the appellant in his action to recover damages against the milling company, unless it contributed to the injuries for which a recovery is sought. Appellant is asking for the particular damages which resulted from the overflow in the flood of June, 1908, including the loss of his crops, and not for the permanent injury sustained, and the question, therefore, is whether the obstruction of the river by the milling company has contributed to any extent to throw the water back upon his land. His farm is about 1¾ miles above the dam, while the bridge and the obstruction made by the railway company is about a mile above the dam, and is between the dam, and appellant's farm. In the testimony produced by appellant it was shown that the piers of the railway bridge had been placed in the river, and that many car loads of rock had been thrown across the river near the bridge, and that embankments had also been made by the railway company at each end of the bridge, and that all together made a dam which obstructed the flow of the stream and backed the water upon the lands adjoining the river above the bridge. The court ruled that there was evidence tending to support a cause of action against the railway company, but decided that the detention of the water by the dam of the milling company, 1¾ miles below the farm, did not contribute towards the flooding of appellant's land.''

Again in Hodge v. Lehigh Valley Railroad Co., 56 Fed. 195, the Circuit Court for the District of New Jersey in ruling for the defendant, l. c. 196, 197, said:

''Now, this land is nearly a mile distant from the bridge, eastwardly. The bridge was erected by legislative authority, as part of a railway line. It was designed by, and constructed under the supervision of, an experienced and capable engineer. . . .

''But, besides, there is testimony strongly tending to show that before the bridge was built the eastern bank of the Raritan above the bridge site was protected against the current, which there directly strikes the bank, by rip-rapping,—a precaution which has since been neglected. . . .

''The plaintiffs' case rests upon inferences. The evidence on their part is not convincing or satisfactory, even if taken by itself. But when the evidence on both sides is considered together, and as a whole, then, undoubtedly, the clear preponderance is with the defendant. In our judgment the jury have made unwarrantable deductions from the evidence, and, moved by our sense of justice, we must set aside the verdict.''

The District Court of Nebraska, in Brown et al., v. C., B. & Q. Railroad Co., 195 Fed. 1007, passing on a similar set of facts, had this to say, l. c. 1011:

"The fact that the water was dammed up behind the bridge girder and the railway embankment flanking the bridge does not show that otherwise it would not have been over the land deep enough, and for sufficient time, to have destroyed the plaintiff's crops and to have done the other injuries complained of. Such obstruction of the water does tend to show that to the extent of the excess of height of the water north of the embankment and bridge over that below them, and over the area reached only by this excess, an effect was traced to the embankment and bridge. It is said that the contour maps enable the jury to ascertain the amount of land thus affected by the height of the water against the bridge girder, and to that extent the plaintiffs made a prima facie case. This would be conceded, if the bridge girder were the only obstruction raising the water to that height; but the evidence shows that the railway embankment for a long distance on either side of the bridge was of the same height that the water rose upon the girder. As no complaint was made of this railway embankment and no evidence was offered to show the extent to which the water was retarded by the girder alone, the jury had no basis by which to determine what amount of water it backed upon plaintiffs' lands.

"Summing up the principles applied in these decisions, it may be stated that in an action of this kind it is not sufficient to prove an obstruction of a stream, and that such obstruction contributes to causing an overflow and an injury; but the amount of overflow and damage which is caused by such obstruction must be traced. Ordinarily this requires that a comparison be made by evidence as to what overflow and injury would have existed in the course of nature under similar circumstances if there had been no obstruction, and only for the differences between the results is the one causing the obstruction liable.

"As there was no evidence from which the jury in these cases could have made this comparison, the verdicts were properly instructed for the defendant, and new trials are denied."

From an examination of the entire evidence offered in this case we cannot help but conclude that plaintiff wholly failed to produce sufficient evidence to elevate his case from the field of guess, conjecture and speculation and that from the evidence the most that could be said in favor of plaintiff is that the negligence charged against the defendant was a remote or possible cause of plaintiff's damage. Evidence no stronger than this record discloses is not sufficient in law to take the case to the jury and a jury's verdict on

652

such evidence is nothing more than a speculation as to the cause of the damage.

Under the record made in this case the plaintiff must fail and the trial court erred in refusing defendant's demurrer at the close of the case and for that error this cause is reversed and remanded with directions to set aside the judgment below and enter judgment for the defendant. It is so ordered. All concur.