Finis RECTOR, James Rector, Gladys Rector, Billy Newlin, Jim T. Newlin, Letha M. Newlin, LaVerne Hyde and Mildred Hyde, (Plaintiffs) Appellants,

v.

TOBIN CONSTRUCTION COMPANY, Inc., a Corporation, (Defendant) Respondent.

No. 30710.

St. Louis Court of Appeals.

Missouri.

Nov. 21, 1961.

Motion for Rehearing or to Transfer to Supreme Court Denied Dec. 26, 1961.

Charles A. Powell, Jr., Macon, for appellants.

William H. Becker and Terence C. Porter, Columbia, Bollow, Crist & Oswald, Shelbina, for respondent.

WOLFE, Judge.

This is an action for crop damages. It is in three counts. The damages for which recovery is sought arose out of the flooding of the plaintiffs' land. It was alleged in the plaintiffs' petition that the defendant constructed a dirt fill or dam across the bed of the Middle Fork of the Chariton River in Macon County, Missouri. This was done while defendant was engaged in building a bridge for the State Highway Department. It was alleged that this fill obstructed the flow of water, and that it caused the Middle Fork to overflow onto the lands owned by the plaintiffs.

Count 1 is for damages to the crops of Finis Rector, James Rector, and Gladys Rector. Count 2 covers crop damage to the land owned by Billy Newlin, Jim T. Newlin, and Letha M. Newlin. Count 3 is for crop damage suffered by LaVerne Hyde and Mildred Hyde, who owned the third tract of land. The plaintiffs sought double damages under Section 236.270 RSMo 1959, V.A.M.S. The trial was to the court, and from a finding and judgment for the defendant the plaintiffs prosecute this appeal.

The land area under consideration extends for almost a mile northwardly from the southernmost easement line of Highway 36, which runs in an east and west direction. The Middle Fork of the Chariton River flows generally southwardly through the area to a point where it is now crossed by the bridge which is part of Highway 36. For about a third of a mile it flows almost due south from the northernmost line of the general area. It then turns westwardly and runs in that direction for about the same distance to a point where it turns to the south again. At this turn it is joined by a drainage ditch 12 feet wide; which runs southwardly from a dike that borders the northernmost part of the Rector property. From the point where the ditch joins the river, the flow continues south until it passes under and beyond the highway bridge.

The highway bridge was constructed by defendant Tobin Construction Company under a contract with the Missouri State Highway Commission. In order to move its heavy earth-moving equipment and material across the Middle Fork, in the process of constructing the bridge, the Tobin Company built an earth fill extending

from one bank of the stream to the other. The fill was about 14 feet wide and 35 to 40 feet in length, which was the width of the Middle Fork riverbed. The height of the fill was variously fixed by the plaintiffs' witnesses at from 8 to 12 feet, and defendant's witnesses said that it was 6 to 7 feet high. All were agreed that it dipped down toward the center. About one-half foot from the bed of the Middle Fork a corrugated metal pipe 3 feet in diameter ran through the fill parallel to the bed, thus permitting the normal flow of the stream to pass through. The fill was built upon the right of way duly obtained by the Highway Commission for the highway. The contract for the construction of the highway bridge made no provision for the construction of any fill across the Middle Fork.

The flooding of the lands took place in the latter part of July 1957. One of the plaintiffs' witnesses, a man named Edwards, who measured the rainfall at his home, testified to the various amounts of rain he measured from July 15 through July 29. He took the measurements at his home, which was a mile and three-quarters east of the area in question. He testified that on July 15 there was a rainfall of 2.35 inches; on July 22 there was 3.7 inches; and on July 27 there was 1.66 inches of rain. He stated that he measured one inch of rain on July 29. Finis Rector, the plaintiff in Count 1 of the petition, testified that he measured the rainfall of July 29 at 2.5 inches.

The Rector farm concerned herein had 85 acres in cultivation, 10 acres of which were west of the drainage ditch referred to by the witnesses as the "Sweaser". Part of the 10 acres was near the foot of a hill, and a portion of it was not flooded. This area was planted in corn. Three of the other areas flooded were east of the drainage ditch and west of the river. There was one area of 20 acres planted in beans that was south of the river, where it meandered westwardly across the farm. In all, there were 30 acres of corn and 55 acres of soybeans. Rector said that the first time he

saw the dam was on July 22. It will be recalled that this was the day of the 3.7 inches of rain. He said that he noticed the water in the creek was not flowing, and having heard that there was a dam by the construction work he went to look at it. He said that water was running over the top of the dam, but the creek was not out of its banks. He saw the fill later, and a cut had been made in its east end. This cut was estimated by him to be 2½ feet wide and about 2 feet deep. He said that water was flowing through it. According to Rector the rain of July 27 caused some flooding and damage to his crop. At that time there was water on the land Saturday night, but it had flowed off by Sunday morning. On July 29 the land flooded and the water stayed on for "possibly two days or less". He said that he harvested 583 bushels of beans and 690 bushels of corn. He also estimated, as a conservative estimate, that he would have had 30 bushels per acre yield of beans if there had been no water damage.

Billy Newlin, testifying on behalf of plaintiffs in Count 2 of the petition, stated that the Newlin tract upon which crop damage was sustained lay to the south of the Rector farm, north of the highway and east of the river. It covered an area of about 18 acres. Beans were planted upon 11 acres of this, and corn on 7 acres. He said that before the land was flooded he estimated the value of this corn at $1,000, and that the corn was a total loss because of the flood. He estimated the value of his beans before flooding at $707.85, and stated that he only got $114 for the crop. On cross examination Newlin admitted that he had land south of the fill, which would be downstream from the fill, that had flooded and suffered crop damage. He stated, "At that time it looked as though the whole area would be ruined, but we were going to drop that south of the highway, not even mention it."

The Hyde farm owned by the plaintiff in the third count of the petition is west of

the river. It had 16.1 acres of soybeans. These were about knee high and needed no more cultivation. After the rain of July 22, Hyde had gone to see Mr. Wilson, who was the project superintendent for the Tobin Construction Company. Hyde told Mr. Wilson that the river was almost at flood stage above the fill, and that there was a forecast of further rain. According to Hyde, Wilson told him not to worry about it, that he would take care of it. Later Wilson told him that he had cut a channel in the top of the fill. He said, according to Hyde, that he could not cut it as deep as he wanted to because his bulldozer had slipped in the mud toward the water and that he had been forced to pull it out with a tractor. Newlin also talked to Mr. Wilson about the fill.

On Saturday, July 27, 9 acres which Hyde had planted in beans were flooded at about noon, but the water had drained off Sunday, July 28. On Monday, July 29, it rained again and flooded enough to cover the beans, and the water stayed on, according to Hyde, for 2½ to 3 days. He said that about 9 acres of beans were destroyed, and that he would have had a yield of 30 bushels to the acre. Numerous witnesses who testified on behalf of the plaintiffs stated that the land was subject to frequent flooding. One witness testified that water that just washes through and does not stand on the crops does not damage them, but that water standing on the crops causes damage. Another witness said that he saw the water on the land after the rain of the 29th, and it was like a lake. There was no evidence that flood waters did not stand on the land in periods of comparable rainfall when the flow of the river was not obstructed. There was evidence of harvesting cost, about which there was no dispute. The value of beans was $1.95 per bushel and harvesting at $5 per acre. We find nothing about the market value of corn in 1957.

In the defendant's case it was stipulated that the contract with the State Highway Commission made it necessary for the defendant to move dirt across the creek, and the defendant's machines were obliged to cross it. Mr. Everett E. Baker, engineer for the State Highway Department, testifying for the defendant, said that he saw the fill and that the making of such fills was a general construction practice. He stated that he was empowered to stop improper practices engaged in by companies contracting with the Highway Department, but that he saw nothing improper in putting in the fill. He knew of no other way to cross the stream without elaborate bridging, which had never been done before. He stated that the fill was reasonably necessary for the work being done.

An employee of the Tobin Construction Company who was engaged in engineering and survey work testified that he had made a survey of the area. From the survey he prepared a plat which showed the elevations of the high water marks in the area and the elevations at the fill. He said that the banks of the river had not been flooded and that there were no indications, such as mud upon the weeds that grew along the banks, that the river had been out of its banks. The high water marks on the Rector property ranged from 3½ feet to 7 feet higher than the high water marks just north of the fill and somewhat higher than that in relation to the top of the fill. The water on the flooded area of Newlin's land was from ½ foot to 2.3 feet higher than the height of the water by the fill. The Hyde land high water mark was from about 1 to 3 feet higher than the high water mark at the banks of the river.

Wilson, the project superintendent, testified that he talked at various times with Newlin, Hyde, and others during the process of the work. He said that he did not recall exactly what was said in the conversations relating to the fill, but he did attempt to cut the fill after the rain of July 22.

There was also testimony in the defendant's case by several witnesses who farmed land south of the fill. They stated that there was flooding on the land that they farmed during the latter part of July.

The regional manager of the Doan Agricultural Service was employed by the defendant to examine the flooded area and to estimate the crop damage on the various tracts herein considered. He determined that the crop damage suffered by each was as follows: Rector—corn 286.65 bushels, beans 705.9 bushels; Newlin—corn 484.4 bushels, beans 182 bushels; Hyde—beans 176 bushels.

The trial court found that the fill materially retarded the flow of the water and caused the water to stand on plaintiffs' land. It found that this caused damage to the crops of the plaintiffs. It went on to hold that the fill was reasonably necessary to the work that the defendant had contracted to do. It further held that the defendant company, in the absence of negligence, which was not pleaded or relied upon, was not liable for the losses. This was predicated upon the theory that the defendant was entitled to share the sovereign immunity accorded to the State Highway Department. The court held that since the fill was reasonably necessary for the work, no recovery could be had by the plaintiffs.

In accordance with Section 510.310, subsection 4 RSMo 1949, V.A.M.S., we review cases tried by the court "upon both the law and the evidence as in suits of an equitable nature", and "the judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Under this statute we independently consider the evidence and reach our own conclusions. We generally accord deference to the findings of the trial court where the decision must rest upon the credibility of the witnesses. In re Petersen's Estate, Mo.Sup., 295 S.W. 2d 144, loc. cit. 148; Leggett v. Missouri State Life Insurance Company, Mo.Sup., 342 S.W.2d 833, loc. cit. 850.

On the question of the liability of the defendant, the plaintiff contends that the court erred in holding that the defendant could not be held accountable for the damages caused by the fill because the defendant shared the immunity of the State Highway Commission. There appears to be no question that the Commission is not liable for tortious acts of its agents and employees. Bush v. State Highway Commission of Missouri, 329 Mo. 843, 46 S.W. 2d 854; Broyles v. State Highway Commission of Missouri, Mo.App., 48 S.W.2d 78; Manley v. State Highway Commission, Mo. App., 82 S.W.2d 619. This, however, does not exempt the agent or employee from liability for his own tortious acts simply because he was working for the State.

The defendant here contends that the court's holding was correct, and that the defendant is liable only for its negligence. It relies, as the trial court did, upon the cases of Kenton v. Massman Const. Co., Mo.Sup., 164 S.W.2d 349, and Evans v. Massman Const. Co., 343 Mo. 632, 122 S.W. 2d 924. Both of these cases arose out of the construction of a dike in the Missouri River. The dike was constructed by the defendant under a contract with the United States Government. In these cases it was contended by the plaintiffs that the defendant contractor negligently extended the dike and thereby caused other dikes to break and flood their land. In both cases it was held that the defendant was not in any way negligent in constructing the dike. The defendant constructed it according to the plans and directions given him. The work was executed under the direction of United States engineers, and the United States accepted and paid for the dike. Our Supreme Court held that whatever effect the dike had on the water of the river was not chargeable to the contractor but was a matter for which the Government alone was answerable.

These cases follow the rule generally accepted that the contractor shares the immunity of the sovereign when his work is done at and within the direction of the sovereign's agent, such as the Highway

Department. There was nothing present in those cases other than the work that the defendant contracted to do. Before us, however, in the instant case is the fact that the fill was neither called for by the defendant's contract, nor was its building directed by the Highway Department nor was it paid for by it. Apparently aware of this difference the defendant stresses that there was no proof of negligence, and the foregoing Massman cases require that the contractor can only be held for negligent construction. This view of those cases ignores the fact that the defendants were charged with negligence in performing the contract which they did perform, but the act complained of here is beyond the contract. In discussing the rule it is stated in 40 C.J.S. Highways § 212, p. 208:

> " * * * the contractor, and not the highway authority, is liable for damages resulting from his own tortious acts in the performance of the contract, as where he is negligent, or commits an unauthorized trespass on the property off the right of way."

We concur in the finding of the trial court that the evidence did prove that the flow of the river was retarded by the dam and did cause at least some of the flooding of the area. The flooding of another's land by blocking a stream constitutes a trespass. We so held in Corrington v. John Kalicak Bldg. Const. Co., Mo. App., 319 S.W.2d 888, in which we were following Kennedy v. Union Electric Co. of Missouri, 358 Mo. 504, 216 S.W.2d 756, and Ferguson v. Union Electric Company of Missouri, Mo.Sup., 282 S.W.2d 505. A trespass carries with it a liability for damages regardless of the fact that while committing the trespass the defendant was engaged in public work. See Austin Road Co. v. Anderson, 146 Tex. 553, 209 S.W. 595. This case was a trespass where the contractor piled dirt upon the plaintiff's land. Breathitt County v. Hudson, 265 Ky. 21, 95 S.W.2d 1132. This was a trespass where rock was cast upon the land. Timothy J. Foohey Dredging Co. v. Mabin, 118 Ark. 1, 175 S.W. 400, and Kochtitzky v. Bond, 128 Ark. 255, 194 S.W. 8. In both cases trespass was by flooding of the land of the plaintiffs. In Asheville Const. Co. v. Southern Ry. Co., 4 Cir., 19 F.2d 32, the highway contractor, in blasting, threw rocks upon plaintiff's property.

We are not impressed by the contention that the fill was essential to the work being done under the contract. From the photographs in evidence and the plat of the right of way, it appears clear that a passage could have been cut through the banks within the right of way to afford the machines of the defendant a bed level or low level crossing with sufficient drainage. Our conclusion is that the defendant trespassed upon the plaintiffs' land to the extent that the fill caused the water to flood it and stand upon it, and that it is liable for such damages as the fill was instrumental in causing.

This brings us to the question of the sufficiency of the proof of damages. We are dealing here with low-lying land crossed by a meandering stream and a drainage ditch, flanked to the north by a dike and surrounded by hills. It was subject to frequent flooding, and the rains in question brought flood and crop loss to Newlin's property below the dam, and others owning land farther downstream testified to flooding. In the case of Kennedy v. Union Electric Co. of Missouri, 358 Mo. 504, 216 S.W.2d 756, loc. cit. 764, our Supreme Court stated:

> "It is true where part of flood damage would have been caused by an anticipatable overflow, without any obstruction, one who obstructed the stream would not be liable for such part but only for the additional damages caused by his obstruction, as the cases cited by defendant hold. (Citing cases)."

In the Kennedy case there was no difficulty in determining the extent to which

the flooding was caused by the defendant. There was evidence that there had never been an overflow, prior to the building of the dam, high enough to reach the building for which flood damage was sought.

The plaintiffs assert that because the rains of the 15th and the 22nd flowed off, we must assume that the rains of the 27th and the 29th were not permitted to flow off because of the fill. We of course know that in periods of rainfall the effect is normally cumulative. The earth becomes saturated and unable to absorb the water, and streams become swollen. In view of the flooding below the dam, we cannot hold, on the meager facts presented, that there would not have been water standing on some of the crops if there had been no obstruction of the river. There must be presented some evidence of the extent to which a period of like rainfall would normally flood or would not flood the land. Without this there is no yardstick by which to measure the extent that the flooding was caused or increased by the fill. The extent of the trespass is unknown, and the evidence is therefore insufficient to determine the crop loss, if any, attributable to the fill. On the subject of damages, it should also be noted, as stated above, that there was no evidence of the market value of the corn claimed to have been lost.

The plaintiffs claim that they are entitled to double damages by virtue of Section 236.270 RSMo 1949, V.A.M.S. This section provides: "Any person who shall build or heighten any dam, or any other stoppage or obstruction on or across any watercourse, without first obtaining permission from the court of the proper county, according to law, and shall thereby work any injury to any other person, shall forfeit to the party injured double damages for such injury, to be recovered by civil action."

This section is part of Chapter 236, bearing the title "Dams, Mills And Electric Power". The chapter dates back in part to the territorial laws of 1822, and it contains a special procedure for obtaining permission to dam watercourses. The very obvious purpose of the original act was to promote the construction of mills and to protect the owners of land along the watercourse from any damage that they might suffer because of the construction.

In construing a statute we must seek to gather the intent of the legislature from the ordinary meaning of the words used, considering the whole Act and its legislative history. We must promote its meaning and not give it any absurd construction. St. Louis Southwestern Railway Co. v. Loeb, Mo.Sup., 318 S.W.2d 246. The Act obviously deals with dams and obstructions intended to be physically permanent in nature and intended to impound or divert water.

The procedure set out provides that the person desiring to erect a dam shall file a petition in the circuit court of the county in which it is "proposed to erect such mill, electric power and light works, or other machinery, in connection with the dam * * *." Section 236.030. It provides for the issuance of a writ of ad quod damnum directed to the sheriff for a determination of the damage that would be caused to those along the watercourse. Upon the return of the inquest conducted as prescribed, the court may direct a jury trial for any one aggrieved by the verdict.

To apply this procedure to the construction of a temporary crossing which provides for the uninterrupted flow of the normal volume of water would be an impossibility and an absurd extension of the Act to cover matters not within the contemplation of the legislature. The plaintiffs have only their common law right to their actual damages, and the statute has no application to the facts before us.

Doubtlessly the plaintiffs can upon the second trial produce evidence sufficient

to show the extent of the trespass and the value of the crops destroyed by it, so the case is reversed and remanded for a new trial in accordance with the views herein expressed.

ANDERSON, P. J., and RUDDY, J., concur.