Jean SCHRECK, Adm'x. of the Estate of Joe W. Scales, Deceased, Plaintiff-Respondent,

v.

William Frank PARKER, Ruby Marlene Parker, Mercantile Mortgage Company, a corporation, and Roger A. Bailey, Trustee, Defendants-Appellants.

Jean SCHRECK, Adm'x. of the Estate of Joe W. Scales, Deceased, Plaintiff-Respondent,

v.

Joe PENERMAN and Mamie Penerman, Defendants-Appellants.

Jean SCHRECK, Adm'x. of the Estate of Joe W. Scales, Deceased, Plaintiff-Respondent,

v.

Walter C. KLEIN and Olga H. Klein, Defendants-Appellants.

Jean SCHRECK, Adm'x. of the Estate of Joe W. Scales, Deceased, Plaintiff-Respondent,

v.

Jimmy PEQUES and Bevador S. Peques, Defendants-Appellants.

Jean SCHRECK, Adm'x. of the Estate of Joe W. Scales, Deceased, Plaintiff-Respondent,

v.

Willie Myrtle GOOCH, Bank of Sikeston, a corporation, R. A. Bailey, Trustee, and W. S. Corrigan, Trustee, Defendants-Appellants.

Jean SCHRECK, Adm'x. of the Estate of Joe W. Scales, Deceased, Plaintiff-Respondent,

v.

W. O. CHAPPEL, Beulah Mae Chappel, C. E. Stauffer, and Marshall Craig, Trustee, Defendants-Appellants.

Nos. 8324–8329.

Springfield Court of Appeals.

Missouri.

March 17, 1965.

Roger A. Bailey, Sikeston, Thomas L. Arnold, Benton, for defendants-appellants.

W. Clifton Banta, Charleston, for plaintiff-respondent.

STONE, Judge.

This opinion deals with the appeals by defendants (property owners) in six cases (here consolidated) instituted by the same plaintiff, Joe W. Scales, as the assignee of tax bills, to enforce the lien thereof against lots in Sikeston, Missouri, a city of the third class. The improvement, for which the City of Sikeston (hereinafter referred to as the city) issued these (and a multitude of similar) tax bills, was the grading, rolling and oiling of streets under Section 88.643, RSMo 1949 [repealed and substantially re-enacted Laws of 1953, p. 312; amended Laws of 1959, H.B. No. 280, and re-numbered as Sec. 88.811, RSMo 1959, V.A. M.S.].

By four ordinances enacted by the city council on April 24, 1950, the city created four districts numbered 1 to 4, inclusive, each of said districts "being comprised of all of the unpaved streets within the boundaries" of the ward identified by the same number, and directed the city engineer to prepare plans, specifications and estimates of cost for "grading and oiling" designated streets. By four ordinances enacted on April 28, 1950, the city approved and adopted plans and specifications for "the improving by grading, rolling and oiling" of the designated streets in each district, authorized and directed the mayor and city clerk to enter into written contracts with National Road Builders, Inc. (hereinafter referred to as the contractor), authorized the mayor "to serve as supervising agent in charge of said improvement work," and provided for payment by issuance of special tax bills against abutting property on the basis of sixteen cents per linear foot.

The plans and specifications, identical as to all districts except in one minor particular hereinafter noted, are summarized as follows: (1) "Streets in this program shall first be graded to the satisfaction of the city representative and then rolled with an eight ton roller to the satisfaction of said city representative." (2) One of three designated "types of liquid asphalt," to wit, SC–1, MC–0 or A.E.S. 1, "as desired by the city representative" was to be applied. (3) The contractor was to use a distributor with a 20-foot spray bar, equipped with a fifth-wheel tachometer, and asphalt was to be laid at a temperature of approximately 120° F. by a pump "capable of * * * pressure from 20 to 50 pounds." (4) The application of asphalt was to be for a width of 21 feet and at the rate of 0.4 to 0.7 gallon per square yard (except in District No. 4, where the

rate was to be 0.4 to 0.8 gallon per square yard), depending upon the nature and condition of soil being dust coated. (5) All street and alley intersections were to be dust coated at no additional cost. (6) The contractor was to "protect work from traffic until ready for use" and to furnish a construction bond in the penal sum of $10,000.

Under date of May 16, 1950, the city and the contractor executed four written contracts (a separate one for the work to be done in each district) by which the contractor agreed "to grade, roll and oil the roadway" of designated streets in accordance with the plans and specifications approved and adopted by the city council. Pursuant to ordinances subsequently enacted, the city council accepted the work and, in payment therefor, tax bills (including those in suit) were issued in the name of the city and thereafter assigned to the contractor.

After the timely filing of the instant cases in June 1955, they remained pending on defendants' motions until March 10, 1960, when those motions were overruled. In the meantime, to wit, during January 1960, the death of plaintiff Scales had been suggested to the court and, upon motion, Jean Schreck, administratrix of Scales' estate, had been substituted as party plaintiff. V. A.M.R. Rule 52.12(a). On May 9, 1960, defendants filed their answers in which they alleged that the tax bills in suit were void because (a) the city council "was not regularly in session when the three ordinances upon which [the tax bills were] based were passed," (b) "the tax bill ordinance was based upon a fictitious approval of the work," (c) "the contractor did not do the work as required by the contract[s] and specifications," and (d) the tax bills were "fraudulently procured." On July 14, 1961, the regular judge disqualified on his own motion and a special judge was appointed.

On August 11, 1961, defendants filed their motions to dismiss "for failure to prosecute to a conclusion within a reasonable time." The motions pleaded no fact other than that the cases had been "on the docket for more than five years." No hearing was had, and no evidence was offered, on the motions; and on December 19, 1962, they were overruled. One of the points here urged is that the trial judge erred in denial of these motions to dismiss. Of course, a trial court has the inherent power to dismiss for failure to prosecute with due diligence.[1] However, whether any given case should be dismissed for want of prosecution does not depend solely upon the length of time during which the case has been pending [17 Am.Jur., Dismissal, etc., § 77, l.c. 152] but must be determined, in the exercise of a sound judicial discretion, upon all of the facts and circumstances of that particular action. Levee Dist. No. 4 of Dunklin County v. Small, Mo.App., 281 S.W.2d 614, 618(12); 27 C.J.S. Dismissal & Nonsuit § 65(2), l.c. 435, 437. With the presumption always being that the decision of the trial court was correct and the burden always resting upon appellants to make an affirmative showing of error as a condition precedent to reversal,[2] and with no evidence whatever as to who was responsible for, or as to what caused, the delay in the instant cases, we may not convict the trial court of error in overruling motions to dismiss for failure to prosecute.[3]

1. Doughty v. Terminal R. Ass'n. of St. Louis, Mo., 291 S.W.2d 119, 121(1); State ex rel. Ballew v. Hawkins, Mo. App., 361 S.W.2d 852, 856; City of Jefferson v. Capital City Oil Co., Mo.App., 286 S.W.2d 65, 68(2); Wiles-Chipman Lumber Co. v. Pieper, Mo.App., 176 S.W.2d 50, 52(2).

2. Morris v. Willis, Mo., 338 S.W.2d 777, 780(7); James v. James, Mo., 248 S.W. 2d 623, 627(8); Cardin v. King, Mo. App., 344 S.W.2d 633, 635–636(3); Lubrication Engineers, Inc. v. Parkinson, Mo.App., 341 S.W.2d 876, 877(2); Staples v. O'Reilly, Mo.App., 288 S.W.2d 670, 678(19).

3. Buchanan v. Cabiness, 240 Mo.App. 829, 838, 221 S.W.2d 849, 855(8); Julius Seidel Lumber Co. v. Hydraulic Press

On July 17, 1963, the cases were tried and taken under advisement; and, on December 26, 1963, the court in each case made a general finding for plaintiff and then entered judgment that the principal of and interest on the tax bill in suit and the court costs were "to be levied on and made out of the property charged with the lien of said special tax bill" and specifically described in the judgment. Defendants-appellants here complain that the trial court "erred in granting a judgment in personam against the defendants in each case." True, judgments in suits for the collection of local assessments and special benefits are judgments in rem, not in personam, and can be only for the enforcing of a lien against the particular property assessed. Schwab v. City of St. Louis, 310 Mo. 116, 142, 274 S. W. 1058, 1066(12); City of St. Louis to Use of Bruennell v. Bressler, 56 Mo. 350, 351(2). But, on this point, counsel for instant plaintiff replies that the judgments under scrutiny *are* judgments in rem which "may be satisfied only out of the property charged with the lien"; and, without burdening this opinion by including one of the judgments in haec verba, suffice it to say that we are of the same mind as to the import, meaning and effect of these judgments. Robinson v. Levy, 217 Mo. 498, 520–521, 117 S.W. 577, 584(10). Another of defendants' points is that "the ordinances authorizing the contracts for the work to be done and the issuance of tax bills therefor were not passed at a regular meeting, a special meeting, or at a regularly adjourned meeting of the city council and therefore were void." One of defendants' attorneys vigorously pressed the same point on precisely the same evidence in a previous suit upon another tax bill issued pursuant to the same ordinances; and we there carefully considered, exhaustively discussed, and plainly ruled this point adversely to the defendants in that case. Scales v. Butler, Mo.App., 323 S.W.2d 25, 27–29. No effort now is made to demonstrate error in that holding. Rather, it simply is ignored. In these circumstances, the same point neither requires nor deserves repetition and reiteration of what we previously recorded as to the relevant facts and wrote as to the applicable law.

All of the other points (five in number) in defendants' brief are directed to a single issue, namely, whether the contractor *substantially performed* the work in accordance with the plans and specifications adopted by the city council and by reference embodied in the written contracts between the city and the contractor. If there was such substantial performance, the tax bills issued in payment for the work are valid.[4] If there was a failure of substantial performance, the tax bills are invalid.[5] In this inquiry, we must remain mindful that deviations from the plans and specifications justify and permit a finding of failure of substantial performance only when (1) the general character or location of the improvement has been changed materially, (2) an undue advantage to the contractor has resulted, (3) a fraud has been worked on

---

Brick Co., Mo.App., 288 S.W. 979, 981(5, 6). See Fuhler v. Gohman & Levine Const. Co., 346 Mo. 588, 598, 142 S.W. 2d 482, 486(11–13); 17 Am.Jur., Dismissal, etc., § 80, p. 154.

4. Town of Carrollton to Use of Hanchett Bond Co. v. Tonnar, Mo.App., 28 S.W. 2d 443, 446(6, 8); Town of Carrollton ex rel. Barrie v. Thomas, Mo.App., 24 S.W.2d 218, 222(7, 8); City of Glendale ex rel. and to Use of Keyes v. Armstrong, Mo.App., 17 S.W.2d 604, 607–608(7); City Trust Co. v. Cunningham, Mo.App., 7 S.W.2d 456, 459(6); City of

Webster Groves to Use of Lafayette South Side Bank of St. Louis v. Reber, Mo. App., 226 S.W. 77, 79–80(7); Coatsworth Lumber Co. v. Owen, 186 Mo.App. 543, 557, 172 S.W. 436, 440(7); Myers v. Wood, 173 Mo.App. 564, 577, 158 S. W. 909, 913(7); Trimble v. Stewart, 168 Mo.App. 276, 278, 153 S.W. 1086, 1087(1).

5. Casteel v. Dearmont, 221 Mo.App. 1217, 1224, 299 S.W. 816, 819(10); Burress v. Spring, 143 Mo.App. 688, 128 S.W. 27(7); Traders' Bank v. Payne, 31 Mo.App. 512, 521.

the public, or (4) the value or appearance of the abutting property has been injured.[6]

The specifications and the language of the contracts (i. e., "to grade, roll and oil the roadway" of designated streets) indicate that substantial performance by the contractor involved work in three areas, to wit, grading, rolling and oiling. And, with instant defendants charging that there was a want of substantial performance in each area, we treat of those areas seriatim.

*Of grading.* The first specification was that "streets in this program shall first be graded to the satisfaction of the city representative." Defendants do *not* contend that the streets were not graded to the satisfaction of the city representative. But their complaint is that, whereas the contractual obligation to grade rested upon the contractor, the grading actually was done by employees of the city using a grader owned by the city, and that thereby the contractor obtained an undue advantage and a fraud was worked on the public. Plaintiff's witnesses, namely, witness O'Leary who had been the contractor's superintendent in charge of the project under discussion and witness Wilson who had been the "working foreman" on the job, frankly conceded that the grading had been done by city employees using a city-owned grader. Superintendent O'Leary then explained that Mayor Cravens, who had been authorized by ordinance "to serve as supervising agent [for the city] in charge of said improvement work," had told O'Leary that the city had a couple of road graders and the contractor "didn't have one there"; that "some gas company" would be laying "a lot of pipe up and down" some of the streets soon after they were oiled; and that, if the con- tractor would "go back and shoot [reoil] over where they put these pipes in," the city would do the grading. So, as O'Leary put it, "I made that trade with the mayor * * *."

■ Defendants' argument runs along the line that this oral arrangement to trade work (a) resulted in "a substantial advantage" to the contractor because the latter thereby found it unnecessary to purchase or lease a grader (however it was not shown whether the contractor had one located elsewhere) and to pay workmen for the operation thereof, and (b) worked a fraud on the public because the city's equipment had been purchased, and the city's employees were paid, out of public funds collected from taxpayers. It is true that, as defendants emphasize, a contract with a municipal corporation "shall be in writing and dated when made, and shall be subscribed by the parties thereto, or their agents authorized by law and duly appointed and authorized in writing" [V.A.M.S. § 432.070] and that the written contracts between the city and the contractor executed on May 16, 1950, could not have been modified or changed by any oral arrangement between the mayor and the contractor's superintendent. United Const. Co. v. City of St. Louis, 334 Mo. 1006, 1021, 69 S.W.2d 639, 645–646(6). However, although the oral arrangement to trade work undoubtedly could not have been enforced,[7] it apparently was carried out.

■ Since subletting was not proscribed either by the written contracts between the city and the contractor or by the ordinances authorizing execution of those contracts, it would not have been unlawful

6. Town of Carrollton to Use of Hanchett Bond Co. v. Tonnar, supra, 28 S.W.2d at 446; Town of Carrollton ex rel. Barrie v. Thomas, supra, 24 S.W.2d at 222; Myers v. Wood, supra, 173 Mo.App. at 577, 158 S.W. at 913; Trimble v. Stewart, supra, 168 Mo.App. at 280, 153 S.W. at 1087. See State ex rel. Tonnar v. Bland, 324 Mo. 987, 991, 25 S.W.2d 462, 464.

7. Needles v. Kansas City, Mo., 371 S.W.2d 300, 306–307(4–8); Fulton v. City of Lockwood, Mo., 269 S.W.2d 1, 7–8(16–18); Fleshner v. Kansas City, 348 Mo. 978, 981, 156 S.W.2d 706, 707(3); W. W. Cook & Son v. City of Cameron, 144 Mo.App. 137, 128 S.W. 269.

for the contractor to have sublet the grading.[8] On the other hand, it was not unlawful for the city to grade its own streets. V.A.M.S. § 88.507; Proper v. City of Independence, Mo.App., 328 S.W.2d 55, 58. Accordingly, whether the trading of work between the city and the contractor, *in fact*, resulted in substantial advantage to the contractor or worked a fraud on the public depended upon whether the fair and reasonable monetary cost or value of the work done by the contractor (in exchange for the grading) equaled or exceeded the fair and reasonable monetary cost or value of the grading. The *only* evidence bearing upon this subject was the single statement by superintendent O'Leary that the contractor spent "twenty days catching up on this gas company deal * * *." But there was *no* evidence as to (a) the equipment used by either the city or the contractor on the work traded, (b) the length of time such equipment was used on that work, (c) the reasonable value of the use of such equipment, (d) the number of persons employed by either the city or the contractor on the work traded, (e) the number of man-hours such employees of the city or the contractor were occupied on that work, or (f) the wages paid to such employees on that work. In fine, the record affords no basis for even an informed guess as to the relative monetary cost or value of the grading or of the work done by the contractor in trade therefor.

There was no evidence that the streets were not graded to the satisfaction of the city representative; and for aught that appears in the record, which we must take as it comes to us [Bennett v. Wood, Mo., 239 S.W.2d 325, 327(2); Garrard v. State Dept. of Public Health & Welfare,

Mo.App., 375 S.W.2d 582, 586(3)], no one was in any wise prejudiced by the trading of work between the city and the contractor [Brick & Terra Cotta Co. v. Hull, 49 Mo.App. 433, 442(3)] and the benefits conferred and the burdens imposed upon instant defendants were to no extent affected by such trading of work. In re Mayden, 156 Iowa 157, 135 N.W. 571, 572. Having in mind that the tax bills themselves were "prima facie evidence of the liability of the property charged therewith to the extent and amount therein specified" [Sec. 88.643, RSMo 1949] and that the burden of proving their invalidity rested on the defendants, as the parties attacking them,[9] we are unable to find a failure of substantial performance in the grading.

*Of rolling.* The second requirement was that, after grading, the streets were to be "rolled with an eight ton roller to the satisfaction of said city representative." The evidence on this subject ran the entire scale from strict performance to no performance. At one end of the scale, plaintiff's witnesses, namely, superintendent O'Leary, foreman Wilson, and Stout, who operated the roller (none of whom were in the contractor's employ at the time of trial), testified positively that a 5–8 ton Galion roller was (as O'Leary put it) "on the job from the time it started until it was finished and worked every day" and that no street was oiled until it had been rolled. At the other end of the scale, defendants' witness Ables, the city street commissioner at the time of the improvement but retired at the time of trial, said that he had never seen a roller on the job and that none of the streets had been rolled. In the intervening range, other defendants' witnesses, property owners on some of the oiled streets, offered such state-

8. City of St. Louis to Use of Sullivan, Adm'x. v. Clemens, 42 Mo. 69, 73; Brick & Terra Cotta Co. v. Hull, 49 Mo.App. 433, 442(3); Gould v. City of Illmo, Mo. App., 108 S.W.2d 418, 422(6). See Coatsworth Lumber Co. v. Owen, supra, 186 Mo.App. at 550, 172 S.W. at 438.

9. Brink v. Kansas City, 358 Mo. 845, 851, 217 S.W.2d 507, 510(6); Bridges Asphalt Co. v. Jacobsmeyer, 346 Mo. 609, 614, 142 S.W.2d 641, 644(10); Williams v. Hybskmann, 311 Mo. 332, 344, 278 S.W. 377, 380(8); Scales v. Butler, Mo.App., 323 S.W.2d 25, 28(4); City of Rolla to Use of Schulz v. Studley, Mo.App., 120 S.W.2d 185, 188(4).

ments as "if it [Broadway] was rolled, I didn't see it; I don't know, of course, I work," and "there was no roller used to my knowledge." But defendants' witness Harrison, an engineer who on behalf of the city "worked up the plans and specifications for the oiling" and subsequently was employed as city engineer for a brief period, conceded that all of the streets he had "accepted" during his period of employment (the names or number of those streets not being given) had been rolled.

With no specific findings of fact requested or made, the factual issue as to whether or not the streets had been rolled was ruled against defendants by the general finding and judgment for plaintiff.[10] And although we independently consider the evidence and reach our own conclusions, we remain mindful of the superior opportunity of the trial court to judge of "the credibility and characteristics of the witnesses who testified before him,"[11] and we defer to the findings of the trial court upon salient factual issues where the evidence thereon is in irreconcilable conflict and the determination thereof necessarily must rest upon the credibility of the witnesses and the weight to be accorded to their testimony.[12] Viewing the evidence in the light of these applicable principles, we do not find a failure of substantial performance in the rolling.

*Of oiling.* Defendants also complain (a) that at some points "less than the minimum amount of oil required was applied" and (b) that the contractor failed to protect the finished work from traffic. *Defendants'* evidence as to the *amount of oil ap-*

plied to the streets came from witness Harrison, the city engineer for a brief period, and from witness Alt, a "district foreman with the Highway Department" who lived on Broadway, one of the oiled streets. Harrison said that he "was supposed to supervise the work" but that he had "quit" before the project had been completed. When asked what he had done "in the way of checking or * * * supervising," Harrison's reply was that "for one thing I would go to the railroad station to find out how many gallons [there were] in a tank car of oil [and] would see how many square feet or square yards that tank car covered." "Up to a certain point" he checked "to see how many tank cars came in." But, although he did not give the number of square yards oiled before he quit and could not state the number of tank cars that arrived, he was asked "whether the amount was adequate or insufficient" and answered without objection "insufficient." On cross-examination, Harrison stated that "I know on some streets he [superintendent O'Leary] put less than four [0.4 gallon per square yard] and on some streets put more than four," the only basis for that "knowledge" being (so Harrison said) that "I heard him [O'Leary] talking about how many square yards he had." In determining the credibility of this witness and the weight and value to be given to his testimony, the trial judge also had for consideration other testimony by Harrison, such as (1) that, in response to the inquiry on direct examination, as to whether he could "tell us the amount of oil or asphalt applied * * *, the number of gallons per square yard," Harrison conceded "no, I

10. V.A.M.R. Rule 73.01(b); V.A.M.S. § 510.310(2); Sando v. Phillips, Mo., 319 S.W.2d 648, 652(9); Lange v. Baker, Mo.App., 377 S.W.2d 5, 6(1); Davis v. Broughton, Mo.App., 369 S.W.2d 857, 862 (4); Rauth v. Dennison, Mo.App., 357 S.W.2d 201, 206(4).

11. Spaeth v. Larkin, Mo., 325 S.W.2d 767, 771(3); Cull v. Pfeifer, Mo., 307 S.W. 2d 424, 428(5); Peine v. Sater, Mo., 289 S.W.2d 101, 102(1); Allen v. Smith,

Mo.App., 375 S.W.2d 874, 880(8). See Hampton v. Niehaus, Mo., 329 S.W.2d 794, 800(6), 801–802(9, 10).

12. Leggett v. Missouri State Life Ins. Co., Mo. (banc), 342 S.W.2d 833, 850(2); Day v. Blackbird, Mo., 331 S.W.2d 658, 660(2); In re Petersen's Estate, Mo., 295 S.W.2d 144, 148(3); Hoover v. Whisner, Mo.App., 373 S.W.2d 176, 182(7); Rector v. Tobin Const. Co., Mo.App., 351 S.W.2d 816, 820(1).

can't," and (2) that, upon trial of a prior case, he had agreed that, before he quit as city engineer, the only street he could recall "that didn't comply with the specifications" was Pine Street, although upon trial of the instant case he said that he had accepted only "forty or fifty per cent" of the streets (none of which he could identify by name) oiled while he was city engineer.

Witness Alt, an interested and willing, if not eager, participant in the trial, "measured the front of Broadway when they first shot [oiled] it—that's when I found out that we got a light shot." Alt also said (as did another witness) that "a part" of Illinois Street "wasn't even shot." But, as with Harrison, the trial judge might have been influenced, in determining the credibility of witness Alt and the weight and value to be accorded to his testimony, by other statements of Alt. For example, at one point in his testimony Alt commented that the specifications "strictly said to shoot at seven-tenths [0.7 gallon per square yard] and it was not [so] shot," whereas the specifications actually provided for application at the rate of 0.4 to 0.7 gallon per square yard, except in District No. 4 where the rate was 0.4 to 0.8 gallon per square yard. Again, when Alt's attention first was directed to the three types of liquid asphalt designated in the specifications, to wit, SC-1, MC-0 and A.E.S. 1, he glibly professed to have knowledge of, and to have worked with, each of the designated "formulas." But when subsequently interrogated as to how A.E.S. 1 penetrated into loose sand, Alt answered "I never did use any of it." And when recalled in surrebuttal, Alt returned to his profession of familiarity with A.E.S. 1 and described it as "high setting asphalt and we used it for sealing and it will cure hard in three hours," only to admit eventually, when pressed by both the court and opposing counsel, that he had been talking about some other formula (similar, so Alt thought): "it [A.E.S. 1] ain't that number in our book here; I've got a perfect asphalt book in the car"—"* * * so far

I haven't located it [A.E.S. 1] in this asphalt book and I don't know of any other."

*Plaintiff's* evidence as to the *amount of oil applied* came from superintendent O'Leary, who said that employees had been directed to apply the oil "at a minimum" of 0.5 gallon per square yard and that 28 tank cars of oil had been used on this project, and from foreman Wilson, who stated that the oil had been applied at 0.5 gallon per square yard "straight run down the street" and that the rate of application had been no lower than that on any street. Under the same principles hereinbefore discussed in connection with the evidence pertaining to rolling (see cases cited in footnotes 10, 11 and 12), we do not find a failure of substantial performance with respect to the amount of oil applied to the streets.

Many witnesses touched upon the *alleged failure of the contractor to protect the streets from traffic after oiling.* *Plaintiff's* evidence was that, in attempting to close freshly-oiled streets to traffic, the contractor had used (1) wooden barricades—"all we [the contractor] had and all the city had," (2) flares—"during the course of that work in town we got rid of a gross of flares * * * busted, run over and removed," and (3) binder twine or small rope with red streamers tied to it—"we tried to put as much as seven or eight" streamers on the twine or rope tied across a street. But the fair import of the evidence of *both parties* was that, notwithstanding the contractor's earnest endeavor to keep traffic off freshly-oiled streets for at least seven, or eight hours, drivers frequently and repeatedly ignored the warnings and broke the barriers. To repair the damage thus done by premature vehicular use after oiling, many streets were reoiled by the contractor.

Furthermore, the picture portrayed by the record in its entirety is that the A.E.S. 1 type of oil applied to the streets was an emulsion (i. e., oil "cut back with water"), did not penetrate well in the sandy streets prevalent in Sikeston, and formed a crust

on the surface which, under vehicular traffic, was tracked away on tires or broken down into ruts, regardless of whether there had been premature vehicular use after oiling. Having in mind the factors hereinbefore listed, which will permit a finding of failure of substantial performance (see cases cited in footnote 6), we are unable to say that there was a failure of substantial performance of the contractor's duty to protect the streets from traffic after oiling.

■ Looking at the project as a whole, we are not unmindful that, although the purpose of the project was (in the words of defendants' witness Harrison) "to keep down dust" through the Summer of 1950, the streets began to get dusty within a relatively short time (some witnesses said within two weeks after oiling) and the surface of some streets became so rough that the city found it necessary to regrade within a month or so. However, it is reasonably inferable that this resulted from frailties and deficiencies in the specifications themselves (notably, that use of the A.E.S. 1 type of oil was permitted by the specifications and directed by the city representative, and that vehicular traffic between rolling and oiling of streets was not prohibited), rather than from a failure on the part of the contractor to do the work in substantial compliance with the specifications. If, as we believe and hold, the contractor substantially complied with the obligations imposed by the contracts and by the specifications incorporated therein by reference, the contractor was entitled to be paid and the tax bills are valid even though the extent and duration of the benefits derived from the project fell short of those anticipated or desired. City of Webster Groves to Use of Lafayette South Side Bank v. Reber, Mo.App., 226 S.W. 77, 80 (7); City Trust Co. v. Cunningham, Mo. App., 7 S.W.2d 456, 459(6).

■ Courts approach cases of this character in "a spirit of friendliness to [the] improvements, contracts, ordinances, and laws (that is, assuming that they are legal and just until the contrary appears)" and not with "a frosty attitude, searching as with a lighted candle for technicalities, inadvertences, and minor defects, not of substance, and assigning them an office in overturning an improvement scheme and defeating the collection of tax bills." Gist v. Rackliffe-Gibson Const. Co., 224 Mo. 369, 380, 123 S.W. 921, 924; Tabb v. Burt, Mo. App., 296 S.W. 820, 821(1, 2); City Trust Co. v. Cunningham, 223 Mo.App. 896, 903, 20 S.W.2d 930, 934. And, although review of court-tried cases is upon both the law and the evidence, appellate courts rest under the injunction imposed by antecedent statute and superseding rule that a judgment nisi "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." V.A.M.R. Rule 73.01(d); V.A.M.S. § 510.-310(4); Hoover v. Whisner, Mo.App., 373 S.W.2d 176, 182(7). Reviewing the instant cases in that spirit and under that injunction, we think it clear that the judgments for plaintiff should be affirmed. It is so ordered.

RUARK, P. J., and HOGAN, J., concur.